Prentiss E. SMITH, M.D.,
Plaintiff–Appellant,

Phillip A. Wittmann, et al.,
Movants–Appellants,

v.

**OUR LADY OF THE LAKE HOSPITAL,**
INC., etc., et al., Defendants–
Appellees.

No. 91–3260.

United States Court of Appeals,
Fifth Circuit.

April 29, 1992.

J. Ogden Middleton, II, Charles S. Weems, III, Gold, Weems, Bruser, Sues & Rundell, Alexandria, La., Nathan Lewin, David S. Cohen, Miller, Cassidy, Larroca & Lewin, Washington, D.C., for Wittmann, Landis, Smith and Winsberg.

Kevin Patrick Monahan, Baton Rouge, La., for Prentiss Smith, MD.

Tom F. Phillips, Lloyd J. Lunceford, Baton Rouge, La., for Cranor, et al.

T. Mac Womack, Durrett, Hardin, Hunter, Dameron & Fritchie, Baton Rouge, La., for Our Lady of the Lake Hosp., et al.

Leon Gary, Jr., William C. Kaufman, III, Gary, Fieldy, Landry & Dornier, Donald T. Phelps, J. Rodney Ryan, Jr., Seale, Smith & Phelps, Baton Rouge, La., for Berry.

Before POLITZ, Chief Judge, BROWN and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Dr. Prentiss Smith and his attorneys appeal sanctions imposed under Fed.R.Civ.P. 11 and 26(g), 28 U.S.C. § 1927, and the inherent power of the court. *See Smith v. Our Lady of the Lake Hosp.*, 135 F.R.D. 139 (M.D.La.1991). They also argue that the district judge should have been disqualified under 28 U.S.C. § 455(a) because of his relationship with the defendant hospital and a defendant physician. We reverse the imposition of sanctions and thus need not reach the issue of recusal.

### I.

Smith was a cardiovascular surgeon associated with Our Lady of the Lake Hospital ("the hospital") in Baton Rouge, Louisiana. In 1982 the hospital's executive committee began investigating complaints from recovery room nurses about Smith's medically improper and personally abusive and offensive conduct. The *ad hoc* committee established for the review gave Smith two months to resolve his problems or his hospital privileges would be terminated; this probation was later extended for a year.

During the following year, the hospital began to review the mortality rates of patients undergoing certain cardiac and thoracic procedures, including those on whom Smith had operated. One element of this review was a statistical table comparing the mortality rates for certain surgical procedures of several doctors, including Smith. The table apparently was prepared by Smith's principal competitor, Dr. B. Eugene Berry, and indicated that Smith had a relatively high mortality rate for several procedures, although as Smith points out, the table did not include data about the relative difficulty of each individual operation or

about the doctors who allegedly had higher mortality rates than did he.[1]

After the hospital's cardiovascular staff reviewed Smith's level of care and did not find it inadequate, the executive committee asked the independent Society of Thoracic Surgeons ("the society") to study the data, informing the society that the doctor's mortality rates were unacceptable. During the course of the society's review, representatives of the hospital and the executive committee contacted the society by mail and telephone, although nothing in the record indicates that those communications were inherently fraudulent. The hospital suspended Smith's surgical privileges in March 1985, and in May the society's ethics committee stated that Smith's level of care was substandard. At Smith's request, two other hospital committees reviewed his record and found it wanting.

After he was suspended, Smith pursued the hospital's appeal process, during which a nonbinding *ad hoc* committee reported to the executive committee that the evidence presented to them was insufficient to support the suspension. The committee did conclude that all of Smith's surgeries should be pre-approved by another surgeon, that another surgeon should be present whenever Smith operated, and that his behavior was shameful. His privileges were terminated permanently on June 27, 1986.

Smith then consulted Donald Bivens, an Arizona attorney specializing in physician-hospital disputes. Bivens interviewed five doctors at the hospital, including a member of the executive committee, and the hospital's outside counsel. He also compiled a seventy-eight-page chronology of the proceedings surrounding Smith's suspension and termination. The interviews and chronology included information indicating that factors other than Smith's professional competence—such as his personal character—had caused his termination and that the hospital did not follow its bylaws in the termination process.

Ten months after the firing, Smith turned to the New Orleans law firm of Stone, Pigman, Walther, Wittmann & Hutchinson ("Stone, Pigman"), because he wanted local counsel.[2] During the next two months, according to an uncontested affidavit, lawyers and law clerks for the firm spent more than two hundred hours investigating the factual foundation and potential legal theories for Smith's claim, including interviewing Smith and the attorney who represented him during the suspension proceedings and examining the materials Bivens had prepared.

## II.

In June 1987, represented by the Stone, Pigman lawyers, Smith filed a civil Racketeer Influenced & Corrupt Organizations Act ("RICO") suit against the hospital, six doctors who were members of the executive committee, five members of the board of trustees, and Berry. The suit charged the defendants with, among other claims, using the mails to execute a scheme to defraud Smith of his livelihood and using the pretense of challenging his professional competence to lull him into inaction regarding the actual bases for his termination, i.e., greed and personal dislike, and by ruining his reputation, eliminating him as a competitor in the Baton Rouge market for cardiovascular surgery. The complaint charged that Berry's professional corporation was a RICO enterprise under 18 U.S.C. §§ 1962(a) and (b), that the hospital was an enterprise under *id.* § 1962(d), and that the written and telephone communications between the defendants and the society constituted the necessary pattern of racketeering activity as mail and wire fraud under 18 U.S.C. §§ 1341 and 1343.

In September 1987, the plaintiffs moved to disqualify the district judge because he

---

1. The hospital responds that those doctors performed too few procedures for their data to be statistically meaningful.

2. During the course of this action, Smith was represented by attorneys Phillip Wittmann, John Landis, Randall Smith, and Marc Winsberg. For purposes of convenience, we henceforth will refer to them collectively as "the attorneys" unless the context dictates otherwise.

was a patient of one of the defendant doctors, urologist Redfield Bryan. The judge denied the motion but stated that it could be renewed if the judge had to return to Bryan for treatment. We denied the plaintiffs leave to take an interlocutory appeal from that decision.

In August 1987, the parties began discovery under a joint discovery plan. The following April, the district court stayed discovery, pending a hearing on Smith's motion to amend and the defendants' motion to dismiss. After the hearing, the court denied Smith's motion but did not act on the motion to dismiss. In September, with discovery still stayed, Smith voluntarily dismissed his federal suit. A state law action, filed at the same time as his federal one, apparently is still pending.

In January 1989, the defendants filed a joint motion for sanctions against Smith and attorneys Wittmann, Landis, and Randall Smith under Fed.R.Civ.P. 11 and 26(g), 28 U.S.C. § 1927, and the inherent power of the court. Because the district judge had undergone outpatient surgery at the hospital in October 1987, ten days after ruling on the prior recusal motion, and had undergone a physical examination by Bryan in August 1989, Smith filed a second disqualification motion in August 1990.

The court denied the motion to recuse and, after another hearing, imposed sanctions against Smith and his attorneys. The court ordered Smith and Wittmann, Landis, and Randall Smith to pay over $300,000 in monetary sanctions for the defendants' RICO and rule 11 attorneys' fees and expenses; the court further publicly reprimanded all four attorneys. Smith and the attorneys appeal, arguing that the judge should have been recused and that the court should not have imposed sanctions.

### III.

The primary basis for the sanctions order was Fed.R.Civ.P. 11, which requires that attorneys and parties not file wasteful, frivolous papers. Rule 11 provides,

Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record in the attorney's individual name, whose address shall be stated.... The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper, that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.... If a pleading, motion, or other paper is signed in violation of this rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction....

The district court found that Smith's attorneys made insufficient legal and factual investigation before filing the RICO suit, otherwise they would have found that no basis for such a suit existed. The court concluded as follows:

Had Dr. Smith and his counsel made a reasonable inquiry as required by Rule 11, they would and should have concluded that this RICO suit was totally frivolous and without merit. It would not have taken much of an inquiry to discover this fact. It is obvious to the Court that Dr. Smith and his attorneys filed this suit for the sole purpose of delaying, harassing, and otherwise embarrassing and intimidating the hospital from enforcing its decision to terminate Dr. Smith's privileges.

*Smith v. Our Lady of the Lake Hospital, Inc.* 135 F.R.D. at 146.

More specifically, the court stated that Smith's citation of *R.A.G.S. Couture, Inc. v. Hyatt,* 774 F.2d 1350 (5th Cir.1985), for the proposition that a plaintiff need allege only two related acts of racketeering activity to satisfy the RICO pattern requirement, was insufficient, as a plaintiff still must establish underlying criminal activity. The court also stated that only one of the

defendants had an economic motive to join the charged conspiracy and that the extent to which the evaluation of Smith's abilities was reviewed, along with the affidavits of doctors of the Society of Thoracic Surgeons, contradicted any allegations of criminal activity. Further, the court termed the pleadings "impermissible, misleading and half-truths," *Smith,* 135 F.R.D. at 141, and asserted that it would not allow Smith to "use hired guns to make allegations of fraud and criminal activity on the basis of speculation and implausible inferences which are not only inconsistent with the facts, but could or should have been discovered from the slightest investigation of the facts." *Id.* at 144.

■ We review for abuse of discretion the imposition of rule 11 sanctions. *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405–06, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990). A district court necessarily would abuse its discretion if it imposed sanctions based upon an erroneous view of the law or a clearly erroneous assessment of the evidence. *Id.*

■ The courts judge an attorney's compliance with rule 11 by an objective standard of reasonableness under the circumstances. *Thomas v. Capital Sec. Servs.,* 836 F.2d 866, 873 (5th Cir.1988) (en banc). Reasonableness is reviewed according to the "snapshot" rule, focusing upon the instant the attorney affixes his signature to the document. *Id.* at 874. *See also Sheets v. Yamaha Motors Corp., U.S.A.,* 891 F.2d 533, 536 (5th Cir.1990).

■ In determining whether an attorney has made a reasonable factual inquiry, a court may consider factors such as the time available to the signer for investigation; the extent of the attorney's reliance upon his client for the factual support of the document; the feasibility of a prefiling investigation; whether the signing attorney accepted the case from another member of the bar; the complexity of the factual and legal issues; and the extent to which development of the factual circumstances underlying the claim requires discovery. In determining the reasonableness of a legal inquiry, a court may consider the time

available to the attorney; the plausibility of the legal view contained in the document; the *pro se* status of a litigant; and the complexity of the legal and factual issues raised. *Thomas,* 836 F.2d at 875–76.

## IV.

We view the attorney's duty under rule 11 as particularly important in RICO cases:

Given the resulting proliferation of civil RICO claims and the potential for frivolous suits in search of treble damages, greater responsibility will be placed on the bar to inquire into the factual and legal bases of potential claims or defenses prior to bringing such suit or risk sanctions for failing to do so.

*Chapman & Cole v. Itel Container Int'l B.V.,* 865 F.2d 676, 685 (5th Cir.) (quoting Black & Magenheim, *Using the RICO Act in Civil Cases,* 22 Hou.Law. 20, 24–25 (Oct. 1984)), *cert. denied,* 493 U.S. 872, 110 S.Ct. 201, 107 L.Ed.2d 155 (1989). We in no way retreat from that position today.

■ Nevertheless, given this circuit's requirements for RICO actions *at the time Smith filed his suit,* we must conclude that the district court abused its discretion in basing its decision to impose sanctions upon an erroneous view of the law as it applied to the facts of the case. Although we doubt the merits of Smith's suit, his RICO claim raised "good faith arguments based on existing law." *Perlman v. Pioneer Ltd. Partnership,* 918 F.2d 1244, 1250 (5th Cir.1990), and the attorneys' investigation, while not perfect, was reasonable under the circumstances.

■ To comply with his duties under rule 11, an attorney need not provide an absolute guarantee of the correctness of the legal theory advanced in the paper he files. *City of El Paso v. City of Socorro,* 917 F.2d 7, 8 (5th Cir.1990). Rather, the attorney must certify that he has conducted reasonable inquiry into the relevant law. Sanctions may not be imposed where the signing attorney has conducted such inquiry and the legal argument is based upon "a good faith argument for the extension, modification, or reversal of existing law."

*See, e.g., Smith Int'l, Inc. v. Texas Commerce Bank,* 844 F.2d 1193, 1194 (5th Cir. 1988).

Smith's complaint at least arguably was based upon the law as it existed at the time it was filed. Under *R.A.G.S.*, which was the law of the circuit at the time Smith filed the action, two related acts of mail fraud were sufficient to meet the pattern of racketeering requirement under 18 U.S.C. § 1962(c).[3] If the hospital's mailings and telephone calls were made in execution of a plan to defraud Smith, they would provide the necessary pattern of racketeering activity to support the RICO claim. *Id.* at 1354–55.

Thus, the communications in question need not be inherently fraudulent or deceptive; they merely must involve the mails (or wires) for the purpose of executing the scheme to commit fraud. *See United States v. Aubrey,* 878 F.2d 825, 826 (5th Cir.), *cert. denied,* 493 U.S. 922, 110 S.Ct. 289, 107 L.Ed.2d 269 (1989). *See also Henderson v. United States,* 425 F.2d 134, 142 (5th Cir.1970) (innocent mailings "in furtherance of the alleged scheme" prohibited under federal mail fraud statutes). Even communications devoid of any deception or falsehood may constitute mail or wire fraud if they are integral parts of a scheme to defraud. *See United States v. Vontsteen,* 872 F.2d 626, 628 (5th Cir.1989).

Moreover, the district court's criticism that only one of the defendants had an economic motivation for the alleged fraud would not make an otherwise properly pleaded claim worthy of sanctions. It is not settled law that RICO offenses must be economically motivated. *See McMonagle v. Northeast Women's Center, Inc.,* 493 U.S. 901, 110 S.Ct. 261, 107 L.Ed.2d 210 (1989) (White, J. dissenting) (noting split among circuits concerning whether RICO liability may be imposed where neither the enterprise nor the pattern of racketeering activity had any profitmaking element). Finally, we note that if the plotters, for reasons other than surgical competence,

used the pretext of peer review to lull Smith into not resisting the efforts to fire him, that, too, could be part of the fraud underlying the RICO offense. *See, e.g., Landry v. Air Line Pilots Ass'n Int'l, AFL–CIO,* 901 F.2d 404, 429 (5th Cir.) (recognizing "lulling" in RICO claim), *cert. denied,* —— U.S. ——, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990).

Smith's RICO claim thus had an arguable basis in the law as it existed at the time of filing. It alleged potentially valid RICO enterprises and defendants. The pleadings and case statement also met the pattern of racketeering requirement. *R.A.G.S.* only required two predicate acts, and those acts did not have to be subject to criminal liability outside the context of the scheme they intended to further.

## V.

The district court further improperly applied the law to the facts. We thus cannot agree that the Stone, Pigman attorneys' prefiling factual investigation was sanctionably flawed.

The information that the lawyers had gleaned from their investigation did provide them with grounds to believe that they could support the claim they filed. From their own discussions and Bivens's interview notes, the attorneys could infer that the hospital had terminated Smith's privileges for reasons other than his lack of medical skill. Even Roger Fritchie, outside counsel for the hospital, acknowledged that Smith was "technically marvelous." Further, the evidence that the attorneys had reviewed established that the hospital had not followed its bylaws in terminating Smith's privileges.

Although none of it was conclusive, that information, coupled with the knowledge that Smith was an economic rival of at least one of the defendants, Berry, who appeared to be a driving force behind the termination, and that many of the defen-

---

**3.** We emphasize that under the pattern of racketeering requirement as outlined in *H.J. Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989), Smith's pleadings, with the benefit of hindsight, might not be legally adequate and very well might subject their signers to sanctions for failure to consider the continuity requirement.

dants disliked Smith's character, was sufficient for the attorneys to draw a "reasonable inference that some wrongdoing was afoot." *Lebovitz v. Miller*, 856 F.2d 902, 906 (7th Cir.1988) (finding abuse of discretion in imposition of sanctions). *See also Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 95 (3d Cir.1988) (reversing district court's sanctions order where at time counsel filed complaint, he knew facts that supported a reasonable suspicion of cooperation between the defendants and other parties who could be expected to benefit from the alleged conspiracy).

Additionally, it is beyond question that some of the defendants had contacted the society concerning its review of Smith's mortality rates. Once the lawyers could establish an underlying scheme to deprive Smith of his practice, those communications could serve as the predicate acts for the RICO complaint.

Information contradicting Smith's claims of wrongdoing, such as the extent and apparent openness of the hospital's termination proceedings, although certainly relevant to the merits of the case, did not establish that the claims had no basis in fact. Rather, such information suggested that the defendants' culpability was an issue of fact, to be established through litigation, leaving Smith's attorneys entitled to pursue the claim. Additionally, nothing in the record indicates that the lawyers had any information that should have caused them to believe that the RICO claim was invalid.

Nor does the record establish that Smith and his lawyers had duties that they failed to fulfill. Most significantly, they did not need to have evidence of the substance of the mail and telephone communications that constituted the predicate acts of mail fraud. As noted above, the communications, whatever their content, arguably constituted mail fraud if they took place in furtherance of the scheme to defraud. *See United States v. Aubrey*, 878 F.2d at 826. The fact that the communications were ostensibly "innocent" would be irrelevant if, as alleged in the complaint, they were intended to further the defendants' fraudulent scheme.

The hospital points out that Smith's complaint stated that members of the defendant group attempted to prejudice the society's evaluators against Smith through the publication of false and misleading charges, but Smith and his lawyers had no real knowledge of the contents of the communication. The hospital asserts that this lapse reveals the lack of reasonable inquiry under rule 11. Again, however, so long as the communications were in furtherance of the alleged fraud, their contents were not relevant. In light of the otherwise reasonable inquiry, that error will not justify the imposition of rule 11 sanctions. *See Greenberg v. Sala*, 822 F.2d 882, 887 (9th Cir.1987).

## VI.

 Several other factors support our conclusion. First, an attorney receiving a case from another attorney is entitled to place some reliance upon that attorney's investigation. *Thomas*, 836 F.2d at 875. The lawyers thus were entitled to base their analysis in part upon the factual information provided by Bivens, whose interview reports indicated that Smith had been fired for reasons other than his professional competence or lack thereof and whose chronology of the termination process showed that the hospital's bylaws were violated.

 Second, virtually all of the factual materials relevant to proving the RICO case were beyond Smith's reach, in the hands of the defendants. *Thomas*, 836 F.2d at 875. The essence of the alleged offense was the defendants' agreement and intent to defraud, which cannot be ascertained easily from extrinsic evidence; a party should be given some leeway in making allegations about such matters, as long as the lawyer's investigation is otherwise reasonable. *See Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1363–64 (9th Cir.1990) (en banc). As another circuit has noted,

Because conspiracies are carried out in secret, direct proof of agreement is

rare.... We cannot require an attorney to procure a confession of participation in a conspiracy from one of the prospective defendants before filing suit.... Until some other source of information [becomes] available ... [the plaintiff's lawyer] ha[s] to rely on his client for the factual foundation for the claim. There [is] simply no other source to which he [can] turn.

*Kraemer v. Grant County,* 892 F.2d 686, 689 (7th Cir.1990).

■ In such circumstances, rule 11 "must not bar the courthouse door to people who have some support for a complaint but need discovery to prove their case." *Id.* at 689–90. Without access to such discovery, proving the existence of a conspiracy is usually difficult and often impossible, *Mary Ann Pensiero, Inc. v. Lingle,* 847 F.2d 90, 95 (3d Cir.1988), especially where, as here, the "proof is largely in the hands of the alleged conspirators." *Poller v. Columbia Broadcasting Serv.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). When they filed the complaint, the lawyers knew that the hospital had stated that Smith had lost his hospital privileges because of his inadequate medical skill, yet their investigation turned up indications that his accusers had other, questionable motives, motives that the attorneys could not conclusively discern without discovery.

Third, the record includes uncontradicted evidence that lawyers and law clerks for the firm devoted over two hundred hours to research of the law and facts of the case, a not insubstantial amount even in a case as complex as this.[4] Although we do not suggest a strict quantitative test for evaluating compliance with rule 11, other courts have reversed or refused to impose sanctions where attorneys spent substantially less time on prefiling research. *See, e.g., Jensen v. Electric Co.,* 873 F.2d 1327, 1330 (9th Cir.1989) (investigation reasonable where counsel met with clients for eleven hours before impleading third party defendant); *Greenberg v. Sala,* 822 F.2d

882, 887 (9th Cir.1987) (factual errors contained in complaint did not merit sanctions where attorney had spent approximately one hundred hours interviewing his clients, reviewing records and researching the law before filing); *Maddox v. E.F. Hutton Mortgage Corp.,* 723 F.Supp. 1246, 1248 (M.D.Tenn.1989) (district court refused to find inquiry inadequate where attorney and colleagues had spent more than 190 hours on prefiling investigation).

Fourth, the lawyers had only two months from the time they accepted the case from Smith until the time the statute of limitations would run for some of the pendent state law claims. They thus could not be expected to conduct as complete an inquiry as they could have had Smith consulted them earlier. *See Thomas,* 836 F.2d at 875.

■ Fifth, the district court's conclusion that the filed papers branded the defendants as racketeers, with no factual basis for such accusations, does not support the imposition of sanctions. Although the defendants were not members of that class of offender commonly known as racketeers, violation of the RICO statute inherently brands the defendants as racketeers as a term of art, by virtue of the statute's title.

Additionally, the RICO statute, as understood at the time of the underlying suit, was viewed broadly. As we noted in *R.A.G.S.,* "The scope of the civil RICO statute is breathtaking. An allegation of fraud in a contract action can transform an ordinary state law claim into a federal racketeering charge." 774 F.2d at 1355. Although one of the primary purposes of the statute was to combat the infiltration of organized crime into legitimate businesses, defendants need not engage in the stereotypical mobster behavior to come within the bounds of civil RICO. *See United States v. Turkette,* 452 U.S. 576, 580–81, 591, 101 S.Ct. 2524, 2527–28, 2532–33, 69 L.Ed.2d 246 (1981).

---

**4.** To put the amount of work performed by the law firm in context, we note that at an average hourly rate of $125, a not unreasonable fee for a case of this size and complexity, the firm would have accrued fees in excess of $25,000 even before beginning discovery.

## VII.

■ The district court also stated that it was imposing sanctions under 28 U.S.C. § 1927, the inherent power of the court, and Fed.R.Civ.P. 26(g). Having reversed its ruling as to rule 11, we find that the other bases do not support the sanctions, either.

Title 28 U.S.C. § 1927 provides,

Any attorney or other person admitted to conduct cases in any court of the United States or any territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Nothing in the record justifies sanctions under the statute. Because we have held that the lawyers did not merit sanctions for their conduct in bringing the suit, we see nothing upon which to base a conclusion that the lawyers unreasonably and vexatiously multiplied the proceedings—they merely represented their client with vigor.

The district court further grounded its sanctions order on its inherent powers to assess attorneys' fees and litigation costs when a party "has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *F.D. Rich Co. v. United States ex rel. Indus. Lumber Co.*, 417 U.S. 116, 129, 94 S.Ct. 2157, 2165, 40 L.Ed.2d 703 (1974). However, the record does not show bad faith, the prerequisite for such sanctions, on the part of Smith or the attorneys. *See Chambers v. NASCO, Inc.*, — U.S. —, 111 S.Ct. 2123, 2136, 115 L.Ed.2d 27 (1991).

■ We already have noted that, given the state of the law and the pretrial factual investigation, filing the suit was not sanctionable; nor was maintaining the suit bad faith or abuse of the judicial process. A suit is generally not sanctionable where founded in law and fact, *see Sheets v. Yamaha Motors Corp., U.S.A.*, 891 F.2d 533, 538 (5th Cir.1990); *National Ass'n of Gov't Employees v. National Fed'n of Fed. Em-*

ployees, 844 F.2d 216, 223–24 (5th Cir. 1988),[5] and the post-filing investigation the lawyers conducted did not dispel the basis for Smith's claim. Additionally, the record does not reflect fraud, deception, or misrepresentation or that the suit was designed to burden the defendants.

■ Finally, the court sanctioned Smith and the attorneys for discovery abuses under Fed.R.Civ.P. 26(g), which requires that parties make a reasonable inquiry before conducting or opposing discovery in federal court. Although it did not specify any discovery abuses, the court found that Smith and his lawyers violated that rule.

We disagree. Assuming that they had sufficient grounds to file the suit, the attorneys' requests for depositions and document production do not seem unreasonable, given their need to flesh out the initial complaint. Significantly, the depositions were conducted in compliance with the joint discovery plan that all counsel had agreed to, and the record does not show any objection to the number of the depositions. In short, the lawyers' pursuit of discovery was energetic, but hardly condemnable, given the difficult task of proof before them.

## VIII.

We reverse the district court's order of sanctions. We thus need not consider whether the district judge erred in refusing to disqualify himself.

## IX.

Although we reverse the imposition of sanctions in this case, we emphasize, as we stated in *Chapman & Cole v. Itel Container Int'l B.V.*, 865 F.2d 676, 685 (5th Cir.), *cert. denied*, 493 U.S. 872, 110 S.Ct. 201, 107 L.Ed.2d 155 (1989), that parties and their counsel must be especially diligent before filing RICO complaints, in order to avoid sanctions. We do not retreat from *Chapman & Cole* today. The caselaw has changed since the filing of the instant complaint, making it more difficult to bring a

---

**5.** We recognize that our holdings in *Sheets* and *National Ass'n of Gov't Employees* addressed

only rule 11 sanctions, but we see no reason not to follow their reasoning here.

RICO action in good faith. This continued warning regarding baseless RICO claims should not be taken lightly.

REVERSED and RENDERED.