United States Court of Appeals,

Fifth Circuit.

No. 93-1175.

FEDERAL DEPOSIT INSURANCE CORPORATION, in its Corporate Capacity as Liquidator of the Northwest Bank, Fort Worth (White Settlement), Texas, Plaintiff-Appellant,

v.

Larry H. CALHOUN, et al., Defendants,

Trinity Western Title Co., Defendant-Appellee,

John A. Gilliam, T. Ray Guy, and Cathy Gribble Ries, Appellants.

Oct. 17, 1994.

Appeal from the United States District Court for the Northern District of Texas.

Before POLITZ, Chief Judge, WISDOM and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

The Federal Deposit Insurance Corporation ("FDIC") and its once outside counsel, John Gilliam, Ray Guy, and Cathy Ries ("outside counsel"), appeal the imposition of sanctions under FED.R.CIV.P. 11 and 28 U.S.C. § 1927. Because we find that the district court abused its discretion by imposing these sanctions, we reverse, 148 F.R.D. 160.

I.

The factual basis of this suit begins with a losing case that the FDIC and its outside counsel attempted to bring against Trinity-Western Title Company ("Trinity-Western"). As the facts of that case are necessary to evaluate the imposition of sanctions, we explore those facts in some detail.

The FDIC's claims against Trinity-Western arose out of Trinity-Western's association with Larry Calhoun. In 1984, Calhoun was the main player in a complicated, closely held corporate structure that centered on Northwest Bank ("Bank"). At the top of the corporate holdings, Calhoun was 100 percent owner of Northwest Financial Corporation ("NFC"); his wife was NFC's president; and he was vice-president. NFC in turn was the 100 percent stockholder of the Bank, a federally insured institution that controlled a wholly-owned subsidiary, NWB Corporation, which held title to the Northwest Bank building. Calhoun also acted as president and chairman of the board of both the

Bank and NWB.

In July 1984, Calhoun arranged to have NWB sell him the Northwest Bank building. In a "land-flip," NWB transferred title to NFC, which in turn transferred title to Calhoun. It is this transaction that raised the question of fraud and led to the FDIC's suit.

While the building was estimated to be worth around $5.5 million, the purchase price was $2.5 million. More troubling, Calhoun was able to secure a $4 million mortgage for the property from Mutual Savings and Loan ("Mutual"), which the Bank serviced by assuming a new and higher lease. Mutual apparently believed that the $4 million was the full purchase price of the property. As it turns out, Calhoun had other plans for the "extra" $1.5 million.

Trinity-Western was the escrow agent and title company for this transaction. Through a title attorney, George Day, and escrow agent, Gayle Dickehut, Trinity-Western helped facilitate closing the deal by accepting, holding, and finally disbursing the $4 million provided by Mutual. In doing so, they wrote and recorded a settlement statement that was supposed to advise the parties on how the proceeds of the transaction were to be disbursed. Calhoun delivered the original settlement statement to Mutual.

After Trinity-Western had received the money, but before it had been disbursed, Calhoun "discovered a mistake" in the statement, claiming that he was entitled to almost $1.5 million from the closing. Dickehut corrected the initial statement to reflect that Calhoun would receive that amount and gave him a copy; Calhoun did not deliver this copy to Mutual. The deal then proceeded to close, and Trinity-Western disbursed the "extra" $1.5 million to Calhoun, who allegedly split the money with Day.[1]

In May 1985, the Bank failed, and the FDIC was appointed its receiver and became owner of all claims owed to it. In order best to pursue its rights, the FDIC decided to hire as outside counsel the firm of Jenkens & Gilchrist and its attorneys Gilliam, Guy, and Ries. When Mutual attempted to foreclose its lien on the building, the FDIC, represented by Jenkens & Gilchrist, sued Calhoun and

---

[1]While Day's receipt of the proceeds of the transaction are not at issue in this appeal, notably, Day has pleaded guilty to criminal charges stemming from his involvement with the Bank.

Mutual under theories of fraud and fraudulent transfer.

The FDIC was successful in asserting fraud claims against the now-bankrupt Calhoun by intervening in his bankruptcy proceedings; less successful were the claims against Mutual. While the FDIC temporarily was able to enjoin Mutual from foreclosing on its lien, discovery showed that Mutual had received only the initial closing statement and had never seen the second statement. This revelation undercut the FDIC's case against Mutual, and the parties eventually settled, with the FDIC extracting $145,000 from Mutual.

Casting around for other responsible parties who could make good on the Bank's losses, the FDIC in July 1987 amended its complaint, adding Trinity-Western and its two agents, Day and Dickehut, as parties. At first, the FDIC argued that Trinity-Western was liable for negligent misrepresentation under Texas state law. The alleged misrepresentation was the transmission of the first closing statement to Mutual and the omission of the second statement. The FDIC's outside counsel had researched this issue and concluded in a memo that the tort of negligent misrepresentation was applicable. As per the requirements of rule 11, the amended complaint was signed by attorney Guy on behalf of the FDIC.

Two and one-half years later, the FDIC added a claim of simple negligence against Trinity-Western in a second amended complaint. The basis was that Trinity-Western had failed to train and supervise its agents and, thus, had facilitated the fraudulent transaction. Legal research also was performed by the FDIC's outside counsel, though no memo was written. This filing was signed by attorney Ries.

In May 1991, almost five and one-half years after the filing of the initial complaint, the FDIC's claims against Trinity-Western were ready for trial. Significantly, on the morning scheduled as the first day of trial, Judge Belew, who was to hear the case, recused himself and transferred the case to Judge McBryde.[2] In preparation for trial, a proposed joint pretrial order was entered into which, like the amended complaints, required an attorney's certification; it was signed by Ries. At no point in

_____

[2]The case originally had been assigned to Judge Mahon. In July 1987, he recused himself and ordered a transfer to Judge Belew, who transferred the case to Judge McBryde on April 29, 1991. The trial began on May 2.

the litigation had Trinity-Western filed any potentially dispositive motions, such as a motion to dismiss or motion for summary judgment.

The proceedings were a disaster for the FDIC. After a three-day trial, the district court found against the FDIC on virtually every disputed issue in the case.

Relevant to the question of sanctions, the court held that the FDIC, which stood in the place of the Bank, could not sue directly for the losses it had suffered. The Bank had not been a party to the land-flip and had suffered injury only in its capacity as the sole shareholder of NWB. Moreover, subsequent to the transaction, the boards of both the Bank and the NWB formally had ratified the deal. The court also held that the FDIC had failed to put forward sufficient evidence against Trinity-Western on the questions of duty, failure of duty, and proximate cause for the negligence and misrepresentation claims. The FDIC filed an appeal but later failed to pursue it.

In announcing its judgment, the district court invited the defendants to file a motion for sanctions. After further briefing by the parties, the court entered a sanctions order against the FDIC and its attorneys.

Specifically, the court found that the FDIC and its attorneys had failed to conduct reasonable inquiry into the law so as to conclude that their claims were based upon existing legal principles or the good-faith extension, modification, or reversal of existing law. Moreover, the court concluded that "the only reasonable explanation" for the FDIC's conduct in instituting the action was to "harass Trinity-Western and to burden it with costs of litigation to the end of aiding FDIC in its attempts to extract an unwarranted settlement payment." The court summed up its conclusions by stating that "[t]he reactions of the undersigned judge after the trial of this action ... were that the conduct of the FDIC and its attorneys in pursuing this action was outrageous and that there was no possible justification for the infliction on Trinity-Western or the judicial system of such unmeritorious litigation." The court therefore ordered that the FDIC pay Trinity-Western $87,960.45 for violating rule 11; that Gilliam and Guy jointly and severally pay $63,856.70 for violating 28 U.S.C. § 1927; and that Guy and Ries attend fifteen hours of courses in ethical instruction and write a letter of apology to Trinity-Western.

II.

The Federal Rules of Civil Procedure are designed to ensure the just, speedy, and inexpensive determination of civil claims in federal courts. FED.R.CIV.P. 1. One way the rules forward these goals is to impose a duty to base claims upon factually and legally supportable grounds and to punish litigants and lawyers who unreasonably pursue frivolous suits. Accordingly, rule 11, as in effect at the time of the proceedings at issue here, provided in relevant part:

> Every pleading, motion, and other paper of a party represented by an attorney shall be signed by at least one attorney of record.... The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.[3]

The rule states that certifying attorneys who do not comport with the requirements of the rule are subject to sanctions.

In interpreting the former version of rule 11, this circuit has held that the certifying attorney assumes the following affirmative duties:

> (1) that the attorney has conducted a reasonable inquiry into the facts which support the document;
>
> (2) that the attorney has conducted a reasonable inquiry into the law such that the document embodies existing legal principles or a good faith argument "for the extension, modification, or reversal of existing law"; and
>
> (3) that the motion is not interposed for purposes of delay, harassment, or increasing the costs of litigation.

*Thomas v. Capital Sec. Servs., Inc.,* 836 F.2d 866, 874 (5th Cir.1988) (en banc). In assessing

---

[3]The district court ordered sanctions in this case on January 2, 1993. Rule 11 was amended effective December 1, 1993, to provide that a signing attorney

> is certifying that to the best of that person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—
>
> (1) it is not being presented for an improper purpose, such as to harass or to cause unnecessary delay or needless increase in cost of litigation;
>
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law....

whether an attorney has met these obligations, we apply the "snapshot" rule, measuring the attorney's conduct as of the time of the signing. *Id.* The question we ask is whether the lawyer's certification complies with "an objective standard of reasonableness under the circumstances." *Smith v. Our Lady of the Lake Hosp., Inc.,* 960 F.2d 439, 444 (5th Cir.1992).

In assessing an attorney's legal claims, this court has held that he need not provide an absolute guarantee of the correctness of the legal theory advanced in the papers he files. *Id.* "Rather, the attorney must certify that he has conducted reasonable inquiry into the relevant law." *Id.* Then, regardless of whether the attorney's view of the law is erroneous, sanctions can be imposed only if his position can "fairly be said to be unreasonable from the point of view of both existing law and its possible extension, modification, or reversal." *Id.* at 444-45; *see also Smith Int'l, Inc. v. Texas Commerce Bank,* 844 F.2d 1193, 1200 (5th Cir.1988).

Rule 11 is not the only means of preventing attorneys from abusing the legal process. Congress also allows a court to sanction an attorney (as distinguished from a party) who unnecessarily multiplies proceedings by requiring him to pay the costs of litigation. Section 1927 provides that

> [a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Punishment under this statute is sparingly applied, and "except when the entire course of proceedings were unwarranted and should neither have been commenced nor persisted in, an award under 28 U.S.C. § 1927 may not shift the entire financial burden of an action's defense." *Browning v. Kramer,* 931 F.2d 340, 345 (5th Cir.1991). We therefore require a detailed finding that the proceedings were both "unreasonable" and "vexatious." *FDIC v. Conner,* 20 F.3d 1376, 1384-85 (5th Cir.1994).

Finally, sanctions under rule 11 and § 1927 are reviewed under the abuse of discretion standard. *Cooter & Gell v. Hartmax Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2460-61, 110 L.Ed.2d 359 (1990) (rule 11); *Browning,* 931 F.2d at 344 (§ 1927). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Cooter & Gell,* 496 U.S. at 405, 110 S.Ct. at 2461.

## III.

To begin with, the district court was not pellucid in explaining what legal issues were insufficiently researched or unwarranted. This failure to lay out the grounds for such serious sanctions may itself be reversible error. We have long held that a district court, in applying sanctions, may have to make a detailed explanation for its legal reasons. *Thomas,* 836 F.2d at 882-83. "Like a sliding scale, the degree and extent to which a specific explanation must be contained in the record will vary accordingly with the particular circumstances of the case, including the severity of the violation, the significance of the sanctions, and the effect of the award." *Id.* at 883.

The purpose of creating such a record is simple: In order to guard against the application of hindsight by district courts who have sat through long, complicated, and often contentious proceedings, we must not be put in the position of having to guess what unwarranted factual or legal errors were the basis of the sanctions. At very least, such guidelines allow a fair and full appellate review of the decision.

Here, even though the parties seem to agree on the basic legal errors at issue, we find that the district court in its oral opinion failed sufficiently to identify and explain why these issues were violations of rule 11. We do not remand, however, as we find the parties have adequately identified the critical legal issues in dispute.

Trinity-Western argues that the district court properly imposed sanctions, because the FDIC, at the time of the signing of the two amended complaints, had made no legal inquiry into basic corporate law doctrines controlling the Bank's standing to sue, derivative suit requirements, or the defense of ratification. Trinity-Western also contends that the FDIC's research on the merits of the negligence and negligent misrepresentation claims was so superficial as to be an unreasonable basis for suit. Finally, echoing the apparent frustration of the district court, Trinity-Western concludes that the only explanation for what it finds as shoddy lawyering is that the claims could have been brought only to generate fees for outside counsel.

## IV.

We begin by examining the FDIC's basic substantive claims of negligence and negligent

misrepresentation. Texas law recognizes the commonplace tort of negligence in the context of real estate closings. *See, e.g., Zimmerman v. First Am. Title Ins. Co.,* 790 S.W.2d 690, 694-95 (Tex.App.—Tyler 1990, writ denied). Under Texas law, a title company's duties at least run to the parties of a closing and may extend to "possessors of legal rights under the [contract]." *Id.* at 694.

Likewise, Texas allows claims for negligent misrepresentation and has adopted the Second Restatement's definition. *See, e.g., Great Am. Mortgage Investors v. Louisville Title Ins. Co.,* 597 S.W.2d 425, 429-30 (Tex.Civ.App.—Fort Worth 1980, writ ref'd n.r.e.).[4] The duty owed under this tort has been narrowly extended beyond parties in contractual privity and may include intended beneficiaries or parties who foreseeably would rely upon a defendant's representations. *Cook Consultants, Inc. v. Larson,* 700 S.W.2d 231, 234-35 (Tex.App.—Dallas 1985, writ ref'd n.r.e.).

While the district court did not identify explicitly what elements of these legal claims were so unwarranted as to deserve the imposition of sanctions, a reading of its initial order granting judgment against the FDIC highlights two disputed legal issues. First, the court found that Trinity-Western did

---

[4]The Restatement provides:

> Information Negligently Supplied for the Guidance of Others
>
> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient so intends to supply it; and
>
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any one of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

RESTATEMENT (SECOND) OF TORTS § 552 (1977).

not owe any duty to the Bank. Second, any harm suffered by the Bank was not proximately caused by the actions of Trinity-Western.

Without agreeing with the merits of the FDIC's arguments or applauding the depths of its legal research, we find the FDIC's argument not to be implausible, unreasonable, or otherwise frivolous. Moreover, sufficient, if minimal, legal inquiry was made to avoid the imposition of sanctions.

Here, attorney Gilliam testified that he and Ries researched the issues of duty and foreseeability for negligence claims and concluded that, for purposes of the closing, the Bank arguably was within the "zone of danger." Under state law, the issues of duty and foreseeability are closely related, and some caselaw supports the argument that a duty may be owed to foreseeable third parties from the negligent behavior of a party in a fiduciary relationship. *See Gooden v. Tips,* 651 S.W.2d 364, 369-70 (Tex.App.—Tyler 1983, no writ) (holding that in limited circumstances a doctor owes a duty to third parties who may foreseeably be harmed by his negligent conduct toward his patient). The counsel sought to analogize the reasoning in *Gooden* to the title company context.

While no doubt the expansion of tort liability to cover third parties is controversial, we have been cited to no Texas case rejecting this extension of legal concepts. Under rule 11, a party may seek to extend the law, as the outside counsel attempted here, if a good-faith argument is made.

The FDIC's counsel also researched the elements of negligent misrepresentation. While the district court rejected this work product as "shallow," the application of these types of claims against title companies is not questioned. Rather, the district court found that this tort had no basis in the present suit, as the FDIC could not show the necessary element of "reliance." It found as a factual matter that no evidence showed Mutual, the lender, would have acted differently if it had known about the disbursement to Calhoun.

The district court, however, based sanctions upon a finding that the FDIC's claim was legally implausible, not factually unsupported. This finding was error. A plaintiff need not have a fully developed factual case in order to base a suit upon a well-recognized legal claim. Indeed, different factual findings by the district court would have supported the FDIC's claims, such as finding that

Mutual did rely upon the closing statement or that the Bank's board of directors relied upon the statement in ratifying the transaction.

Thus, while the FDIC's claim was doomed after the court made its factual findings, the FDIC's pleading was at least colorable at the time of the signing of the first amended complaint. In later imposing sanctions, the district court went beyond its discretion by applying the clarity of hindsight to judge the complaint.

V.

The second set of legal issues in dispute consists of those pertaining to the requirements of Texas corporate law and the FDIC's capacity to sue. Specifically, the district court found that the FDIC did not have standing to sue in a direct capacity and, in any case, the transaction had been authorized and ratified by the appropriate boards and shareholders. Trinity-Western argues that since the FDIC and its counsel failed to conduct any research on these issues, the imposition of sanctions is automatic.

As a procedural matter, the burden was not on the FDIC to raise these issues. Capacity to sue is a defense, and the federal rules require not only that the defendant raise issues of capacity, but he must do so by "specific negative averment." FED.R.CIV.P. 9(a). Likewise, while ratification is not one of the enumerated affirmative defenses under FED.R.CIV.P. 8(c), Texas law treats ratification as a defense. *See generally* ROBERT W. HAMILTON, 20 TEX.PRAC. § 722 (1994). Defenses objecting to lack of capacity that are not raised are waived. *MTO Maritime Transp. Overseas, Inc. v. McLendon Forwarding,* 837 F.2d 215, 218 (5th Cir.1988).[5] Accordingly, neither of the signed complaints addressed these issues.

Rule 11 requires an attorney, before signing a filing, to make "reasonable inquiry." Reasonable inquiry, however, does not create a *per se* rule that a party research and brief every defense potentially at issue. *Cf. In re Excello Press, Inc.,* 967 F.2d 1109, 1112-13 (7th Cir.1992) (interpreting "reasonable inquiry" language of analogous bankruptcy sanctions rule). Such efforts

---

[5]Indeed, these defenses apparently were not asserted by either Calhoun or Mutual during the pendency of their disputes with the FDIC.

would be not only time-consuming but potentially pointless. Instead, the "reasonableness" of the rules requires a party to consider "whether any *obvious* affirmative defenses bar the case." *White v. General Motors Corp.,* 908 F.2d 675, 682 (10th Cir.1990), *cert. denied,* 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). The question we must ask is whether any of Trinity-Western's defenses was so obvious a bar that under the circumstances it was unreasonable to bring suit.

On appeal, the FDIC argues that it did not have to sue derivatively, as federal common law supersedes state corporate law under the doctrine of *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The FDIC cites several cases that it argues apply the *D'Oench* doctrine and allow the federal government, acting as receiver of a failed banking institution, to sue on behalf of the bank's wholly-owned subsidiaries.[6]

Subsequent to the filing of this appeal, however, the Supreme Court decided *O'Melveny & Myers v. FDIC,* --- U.S. ----, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), which held that state rules of decision govern disposition of state law claims brought by the FDIC as the receiver of a failed savings and loan. We need not decide whether *O'Melveny* governs here, but the decision militates against the imposition of sanctions. If the issue was so unsettled as to require consideration by the Supreme Court, we cannot say that it was so plain as to require the sanctions against attorneys who had based claims upon it. Trinity-Western cites no case binding in this circuit that, at the time, would have precluded making the argument the FDIC now makes on appeal.

Likewise, the issue of ratification was not so obvious as necessarily to have barred the claim. Under Texas law, ratification is not binding upon a corporation if the directors were misled or misinformed. *See, e.g., Dyer v. Shafer, Gilliland, Davis, McCollum & Ashley, Inc.,* 779 S.W.2d 474, 478 (Tex.App.—El Paso 1989, writ denied). Directors, therefore, cannot ratify fraud on themselves.

---

[6]*See Victor Hotel Corp. v. FCA Mortg. Corp.,* 928 F.2d 1077, 1083 (11th Cir.1991) (affirming extension of defense under *D'Oench* to bar claims against a wholly-owned subsidiary of a failed institution); *Astrup v. Midwest Fed. Sav. Bank,* 886 F.2d 1057, 1059 (8th Cir.1989) (holding *D'Oench* doctrine barred claims against bank's subsidiary for contract but not tort claims); *Oliver v. Resolution Trust Corp.,* 747 F.Supp. 1351, 1355 (E.D.Mo.1990) (holding that *D'Oench* doctrine applies with equal force to the wholly-owned subsidiary of a savings and loan institution); *In re Am. Continental/Lincoln Sav. & Loan Sec. Litig.,* 794 F.Supp. 1424, 1455 (D.Ariz.1992) (holding that Resolution Trust Corporation could sue for losses to subsidiary of failed thrift institution where loans made by the subsidiary were funded by the institution).

Such a determination, of course, would require some factual development.

The FDIC was not able to make such a successful case at trial, but at the time of the signing of the amended complaints and even prior to evidentiary rulings at trial, the FDIC had sufficient basis—including directors' testimony—to believe that any ratification defense was itself defeatable. After all, the factual basis of the FDIC's claims was Calhoun's alleged deceptions.

Finally, we must note, our examination of Texas law aside, that we are puzzled by Trinity-Western's failure to bring any dispositive motions. If the legal issues raised by these defenses were so obvious and meritorious that failure to research them is sanctionable, what is Trinity-Western's excuse for failing to pursue them?

In the almost four years between the time Trinity-Western was added as a defendant and the trial, it had ample opportunity to cut short this litigation by filing a dispositive motion; it did not. Likewise, the trial judge, who admittedly was able to consider the case only at the last minute because of a late recusal, did not see fit to truncate the process. These failures to act and then apply blame smacks of "Monday morning quarterbacking."

Our precedent does not allow the imposition of rule 11 sanctions merely for the eventual failure of factual and legal arguments after a trial; sanctions are to be applied only where, at the time of the filing, such arguments were unwarranted. We therefore conclude that the district court abused its discretion in finding that the merits of the FDIC's legal claims were patently unwarranted.

On the issue of whether the FDIC's claims were brought for an improper purpose, we find the district court's holding conclusory. Besides putting forward evidence that the parties were not able to come to settlement, the district court made no showing of objective circumstances leading to the conclusion that suit was brought to harass, delay, or needlessly increase costs. When a complaint is well grounded in fact and warranted by existing law, "only under unusual circumstances ... should the filing of [papers] constitute sanctionable conduct." *Sheets v. Yamaha Motors Corp., U.S.A.,* 891 F.2d 533, 538 (5th Cir.1990).

Here, the district court found the claims well grounded in fact. As noted above, we find that they were warranted by existing law. Because no unusual circumstances has been put forward, the

imposition of sanctions under this requirement of rule 11 was beyond the district court's discretion.

## VI.

Because we find no rule 11 basis to impose sanctions for instituting suit for an improper purpose, we necessarily also hold that the imposition of sanctions under § 1927 was error. An imposition of sanctions under § 1927 requires a showing of improper purpose. Here, the district court erred by reasoning that the FDIC's claims were vexatious just because the court found them to be unreasonable.

Section 1927 requires a sanctioning court to do more than disagree with a party's legal analysis; the court must make a separate determination on both the issue of the reasonableness of the claims and the purpose for which suit was instituted. *See FDIC v. Conner,* 20 F.3d 1376, 1384 (5th Cir.1994) ("Before a sanction under 28 U.S.C. § 1927 is appropriate, the offending attorney's multiplication of the proceedings must be both "unreasonable' and "vexatious.' "). Because no separate showing of improper purpose was made, the district court abused its discretion in imposing sanctions under this statute.

REVERSED.