**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 94-10938**
_____

**JOHNNIE DAWSON,**

**Plaintiff,**

**versus**

**UNITED STATES OF AMERICA,**

**Defendant-Appellant,**

**and**

**R. WAYNE HUGHES and
CLAUDE D. BROWN,**

**Appellants.**

_____

**Appeal from the United States District Court
for the Northern District of Texas**

_____
(October 31, 1995)

Before SMITH, BARKSDALE, and BENAVIDES, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

At issue are sanctions imposed by United States District Judge John H. McBryde against Assistant United States Attorneys R. Wayne Hughes and Claude D. Brown, based on a local rule that civil litigants "make a good-faith effort to settle" -- in this instance, a *pro se* Federal Tort Claims Act claim by a federal prisoner for injuries from voluntary recreation, in which Hughes and Brown were counsel for the United States.  The district court abused its discretion; we **REVERSE**.

I.

In early 1992, Johnnie Dawson, incarcerated at the Fort Worth Federal Correctional Institution, filed, *pro se*, an FTCA action, alleging that, while pursuing a fly ball in a prison softball game, he collided with a pole and was injured. Because of the district court's meticulous recitation of, and reliance upon, numerous facts and actions (and non-actions) by the appellant attorneys, and especially because of its numerous findings of fact (made from the bench and in two opinions totalling 70 pages, and quoted extensively in this opinion) extremely critical not only of their conduct, but of them personally, it is necessary to develop similarly the facts in great detail. Moreover, the juxtaposition of the basis for the action (*pro se* prisoner suit for injury while chasing fly ball) against the resulting time, expense, and potential injury to the professional reputations of two attorneys for the United States, underscores the increasing need for better means of resolving prisoner suits.

In his complaint, Dawson alleged that, while chasing the ball, he injured his shoulder when he tripped on a cord located three feet away from, and parallel to, an unpadded pole in the outfield, and collided with the pole; that he had surgery on his shoulder, but had not regained full control and use of it; and that he had sustained "severe mental distress and emotional injury". Dawson claimed that his injuries were caused by the negligence of prison employees in failing to warn about, as well as mark and pad, the

- 2 -

pole and cord; and he sought $600,000 in actual, and $300,000 in punitive, damages, plus attorney's fees.

Attached as an exhibit to the complaint was the Bureau of Prisons' detailed denial of Dawson's administrative claim for $1 million. The denial was based, *inter alia*, on the conclusion that Dawson's "inattention to [his] location while catching the fly ball was the proximate cause of [his] injury".

In its answer, the Government admitted that Dawson was injured by the collision, but denied liability. As affirmative defenses, it asserted that the complaint failed to state a claim upon which relief could be granted; that Dawson was not entitled to, *inter alia*, punitive damages or attorney's fees; that his injuries were not caused by the Government's negligence, but by his own; and that recovery was barred under Texas law, because Dawson's negligence was equal to or greater than any negligence of the Government.

After the Government answered, a district court order issued for the parties to confer and submit a joint status report. Among other things, they (including a representative with unlimited settlement authority) and their counsel were to meet, prior to filing the report, in order to discuss settlement; and they were instructed that "[t]he court expects the parties to comply with the requirements of Local Rule 9.1 that the parties make a good-faith effort to settle".[1] The report was, *inter alia*, to

_____

[1] Local Rule 9.1(a) of the United States District Court for the Northern District of Texas, which has been in effect since December 15, 1977, provides:

> *(a) General Policy.* The parties in every

- 3 -

detail[] the date on which the settlement conference was held, [and] the persons who were present, including the capacity of any representative who was present, ... state[] ... whether meaningful progress toward settlement was made, and ... state[] ... the prospects of settlement.

The joint status report, filed in mid-August 1992, stated that a settlement conference had been held at the prison on August 10, attended by Dawson, appellant Brown (who had authority to settle on behalf of the Government), appellant Hughes (the attorney of record for the Government), Lori Cunningham (Bureau of Prisons, Attorney Advisor), and Linda DuBose (Bureau of Prisons, Paralegal).[2] The parties reported that

Mr. Dawson had previously advised Wayne Hughes that he would accept an amount between $0.00 to $500,000.00 to settle this case.... Little progress towards settlement was made at this time because discovery has not been completed and there remains [*sic*] many disputed facts which must be resolved. Both parties agree that the prospect for a settlement will always be open and will be diligently pursued when they are in a better position to engage in informed negotiations after more information about the case is developed.

civil action must make a good-faith effort to settle; and settlement negotiations shall be entered into at the earliest possible time, well in advance of any pretrial conference.

[2] On August 18, the district court ordered the Government to provide an exact description of the settlement authority of each of the persons attending the settlement conference on behalf of the Government. The United States responded that Brown was its sole representative with authority to settle the case at the settlement conference, and that his authority was unlimited.

(As discussed *infra*, although the Government did not make a monetary offer, it did discuss providing Dawson with additional surgery, if needed.)

On August 18, the district court entered a scheduling order, directing the parties and their counsel to meet to discuss settlement at least 10 days before the pretrial conference (set for March 1, 1993; rescheduled for March 4), and at least 14 days prior to trial (set for late April). Once again, the order provided that:

> [t]he court expects the parties to comply with the requirements of Local Rule 9.1 that the parties make a good faith effort to settle. Within seven ... days of such settlement conference, the parties shall jointly prepare and file a written report, which shall be signed by all counsel for each party, detailing the date on which the settlement conference was held, the persons present, including the capacity of any representative present, a statement regarding whether meaningful progress toward settlement was made, and a statement regarding the prospects of settlement.

The Government moved in January 1993 to dismiss or, alternatively, for summary judgment. Relying on the Texas recreational use statute, Tex. Civ. Practice & Rem. Code § 75.001, *et seq.*, which provides that a landowner who makes its property available for recreational use is liable only if it has been grossly negligent, or has acted with malicious intent or bad faith, the Government asserted that Dawson had not pleaded, and could not prove, a claim against it under the FTCA, under which the Government is liable only "if a private person would be liable to the claimant in accordance with the law of the place where the act

or omission occurred".  28 U.S.C. § 1346(b); *see also* 28 U.S.C. §
2674.

The parties reported on February 22 that a settlement
conference, attended by Dawson, Brown, and Hughes, was conducted on
February 17, at the United States Attorney's office.[3]  They
reported that

> [a] discussion about the merits of the case
> and the evidence was held and [Dawson]
> submitted an offer of settlement.  The
> [Government] did not submit a counter-offer,
> telling [Dawson] the reasons therefore [*sic*].
> *[Dawson] would advise the Court that there was*
> *no good faith offer made by the [Government],*
> *reason being that [Dawson] cannot prove*
> *negligence by the United States.*  The
> conference ended and the parties agreed to
> meet on April 8, 1993 for further settlement
> discussions.

(Emphasis added.)[4]

Although Dawson signed a proposed pretrial order, he did not
attend the March 4 pretrial conference.  But, while the court and
the Government's counsel waited in vain for him to appear, the
court questioned Hughes about the Government's summary judgment
motion, and his familiarity with 18 U.S.C. § 4042, which provides
that the Bureau of Prisons is to provide safekeeping and care for

---

[3]    Dawson was no longer incarcerated.  Although the conference
was scheduled for 10:00 a.m., he did not arrive until around 2:00
p.m.  By that time, the Bureau of Prisons representatives had
understandably left.

[4]    Hughes' notes from the second settlement conference, which the
district court obtained over the Government's objection, reflect
that Dawson offered to accept $10,000.  Language almost identical
to the above emphasized portion of the report concerning Dawson's
position appears in blue ink, in different handwriting, in Hughes'
conference notes, which were in pencil.  Apparently, the language
was added to the report at Dawson's request.

federal prisoners. Hughes stated that he was "[v]aguely" familiar with the statute, but did not think it applicable to an FTCA action. When asked why he thought the Texas recreational use statute was applicable, Hughes replied that the field where Dawson was injured was used for recreational purposes by both prisoners and other groups. The court ruled that the Texas statute was inapplicable, because Dawson was not in prison for recreational purposes; it therefore denied the summary judgment motion. (In its subsequent opinion to that effect, the court stated that it was "disappointed that the government would rely on [the Texas recreational use statute] in light of its blatant inapplicability to the facts of this action", and held that the Bureau of Prisons' duty of care was established by 18 U.S.C. § 4042, independent of an inconsistent state rule.)

The court next questioned Hughes about settlement, inquiring whether any dollar amounts had been discussed in the negotiations. Hughes replied that Dawson had made an offer, but the Government had not. Upon the court inquiring why the Government so acted, Hughes cited (1) the Government's then pending summary judgment motion; and (2) his belief that the action was frivolous. At the conclusion of the conference, the court stated:

> If this was a suit involving a private party, as opposed to the government, it would be a very serious liability suit. And I guess the only reason the government doesn't consider it to be a serious liability suit is it doesn't take things seriously a lot of times when it should.
>
> Now, it may get out of this case because of the failure of the plaintiff to do what he

ought to do, but this is a serious liability suit, and the government should have treated it as a serious liability suit.

I don't think you have acted in good faith. I think you have acted in bad faith.

The district court ordered Dawson to appear on March 11 to show cause why he should not be sanctioned for failing to appear for the pretrial conference. It stated also that disclosures made by the Government's counsel at that conference suggested that the Government and its counsel "have not taken seriously, and probably have violated, the duties imposed on them relative to settlement matters", and ordered that, at the March 11 hearing, the Government and its counsel show cause why they should not be sanctioned for violation of their obligations in respect to settlement matters as established by the court's prior orders and the Local Rule.

In its brief in response to the order to show cause, the Government insisted that it had complied with all of the court's orders. In addition, it asserted that a good-faith effort to settle does not require it to make a settlement offer, and maintained that the court had no power to compel it to do so.

As usual, Dawson did not appear at the March 11 show-cause hearing. A lengthy hearing was then held on possible sanctions; the Government, Hughes, and Brown were represented by counsel from the United States Department of Justice. In response to the district court's inquiry, the Government agreed, "[i]n principle", that, as stated by the court,

the issue ... to be decided is the fact issue ... whether ... the government engaged in a good-faith effort to settle, and that may or

- 8 -

> may not have included ... making ... a settlement offer.

The court then questioned Hughes and Brown.

Hughes responded that, at the first settlement conference, the Government made a non-monetary offer to Dawson, which he refused; and that it did not make a monetary offer because (1) it was unlikely that Dawson could prove his case, in that the pole was open and obvious; (2) Dawson did not demand a specific dollar amount; (3) the non-monetary offer to Dawson was appropriate; (4) the Government needed more discovery and more information; and (5) Dawson was representing himself, and his vague responses to interrogatories and requests for admissions, and his failure to list any witnesses or medical experts, indicated a lack of interest in prosecuting the action.

Hughes stated that, at the second settlement conference, Dawson proposed a monetary settlement, but the Government did not counter-offer because (1) its dispositive motion was pending, and Dawson's response was due that day; (2) Dawson had stated that other accidents had occurred on the prison softball field, but did not provide the names of the persons involved, and the Government wanted to ascertain if any such accidents had been reported; and (3) the Government was not liable, in his opinion, because the post was open and obvious. Hughes stated further that he thought there was "a good possibility" that the Government might have made a settlement offer if it had known that the court would deny its dispositive motion. The court then chastised Hughes for relying on

the Texas recreational use statute, because it had not been pleaded as an affirmative defense.[5]

Brown responded that he never reached a decision not to make a monetary offer, because he was waiting for additional information to be developed. He stated that no offer was made at the first settlement conference because the Government wanted (1) to have Dawson re-evaluated by a doctor and, if necessary, have additional surgery; and (2) to evaluate its liability with respect to the open and obvious pole. Brown stated that no offer was made at the second conference because (1) the Government wanted to verify what Dawson had said about other accidents; (2) the Government's dispositive motion was pending; (3) Dawson's negligence appeared greater than any by the Government, because the pole was open and obvious; and (4) it would not be good policy, or in the best interest of the United States, in his opinion, to make a settlement with a prisoner that might encourage more litigation by other prisoners, who are a "very litigious group".

At the conclusion of the hearing, and over the Government's objection, the court ordered Hughes and Brown to produce their notes from the settlement conferences, as well as all material pertaining to the case in the United States Attorney's office, to

---

[5]     Assuming the Texas statute should have been presented as an affirmative defense, we need not reach whether counsels' raising it in both the summary judgment motion and proposed pretrial order (signed by Dawson) cured the error. Simply put, and in light of Dawson's *pro se* status, persuasive points can be made for both sides of the issue. Equally, whether this failure, or counsels' raising the Texas statute by other means, merited the court's scathing rebuke, as quoted *infra*, is another matter upon which we will not comment.

be placed under seal.  (More than a year later, after advising counsel that he was going to do so, the court reviewed the notes.) The court made the following findings from the bench: (1) there was at least a 50-75% possibility that the Government was liable; (2) if a private party were involved, it would be viewed as "a very significant case for potential liability"; (3) the Government did not prepare itself with the necessary factual and legal knowledge to evaluate settlement;[6] (4) counsel did not act in good-faith at the second settlement conference by relying on the Texas recreational use statute, because it had not been pleaded as an affirmative defense, and, in addition, was "totally without

---

[6]    The court was critical of counsel for not deposing Dawson:

> The government blindfolded itself ... by not taking his deposition.  So I don't know how [its attorneys] could really evaluate what they were looking at by way of damages.  And I think ... that is in bad faith to go into that second settlement conference without more knowledge of the facts than the government attorneys had.  But they had made up their mind, in my opinion, that they weren't going to offer this man anything in settlement for invalid reasons or inappropriate reasons and bad-faith reasons.
>
> ....
>
> Again, I will repeat that if the government's attorneys had done their job and taken [Dawson's] deposition ... and adequately explored it, there may have been other factors that came forward, but I believe I have heard all the information the government's attorneys had at this hearing, and I don't see[] a great deal they would have to argue about at a trial of this case in support of a position that ... Dawson[] should have seen that line when he was running out to catch a fly [ball].

merit";[7] (5) the summary judgment motion was filed in bad faith;[8]

_____

[7] The court stated:

> There is no allegation in [the answer] of any Texas statute or any statute that would support the contention that the law of Texas prohibits recovery by persons who enter upon land for recreational use. That would be an affirmative defense. That defense was not asserted. That pleading was never amended to assert that defense. So that was never a defense available to the government in this case, even if it otherwise would have potential merit. Obviously, the lack of availability of that offense, even if it otherwise had potential merit, should have been taken into account at both settlement conferences.

The court also excoriated counsel for including that defense in the proposed pretrial order:

> In my judgment that was put in the pretrial order in bad faith by counsel for the government with full knowledge that counsel for the government had no right to rely on that. Counsel for the government was [us]ing the pretrial order in an attempt to amend its pleading when counsel for the government knew the pretrial order should state the contentions of the parties that are legitimately in the case. Those contentions are defined by the pleadings, and the government's counsel knew it had no support in pleading that and put that in there to see if it could get away with it, as far as the Court and defendant [were] concerned.

[8] The finding that the summary judgment motion was filed in bad faith was based on the Government's failure to plead the Texas recreational use statute as an affirmative defense, as well as the court's view that the position lacked merit:

> The defendant knew that it had not pleaded that statute as a defense. It knew that it had no right to assert that statute as a defense in this case, even if it otherwise was a viable defense.
>
> And, in addition to that, if the

- 12 -

(6) Hughes was not telling the truth when he said that he had no knowledge of the applicability of 18 U.S.C. § 4042 until the court called it to his attention; and (7) the explanations at the show-cause hearing on why a settlement offer was not made were "unworthy of belief", "frivolous and in bad faith".[9]  At the conclusion of

defendant had conducted the slightest amount of research the defendant would have known that had nothing to do with this lawsuit.  If the defendant had used an ounce of logic, the defendant would have known that had nothing to do with this lawsuit and that [Dawson] was there as an inmate of the prison system.  He didn't come on those premises for recreational purposes.  He wouldn't have been there at all, if he hadn't ... been an inmate in the prison.

[9]    The court found that the Government tried to take advantage of Dawson's *pro se* status and to mislead him about the value of his claim:

I am satisfied that one of the factors that [the Government] took into account in dealing with Mr. Dawson was the prospect that, because he was a pro se plaintiff, they could get away with what they were doing, and that because he was a pro se plaintiff they might by default win the case, as perhaps they have....

....

And I am not going to say that is not a legitimate thing for the government to consider in evaluating whether or not to settle the case, but I don't think it is appropriate in this case, or was proper in this case, to withhold the making of settlement offers at the two settlement conferences because of the possibility he might stub his toe.  That is not good faith.

....

The way I see it, the attorneys, at least at the second settlement conference, did probably sense that there was a good chance

- 13 -

that the defendant would stub his toe and overreacted to that, and unfairly and in bad faith reacted to that, when they should have been at that point in time making some kind of settlement offer in order to try to bring the case to a conclusion at that time.

In its opinion imposing sanctions, the court stated that it did

not consider significantly relevant to the sanction issues the fact that Dawson did not prosecute his claim with diligence, thus leading to its dismissal for that reason. There is nothing in the record to reflect the reason for Dawson's failure at the last minute to pursue his claim other than the suggestion that counsel for defendant made inappropriate representations to him concerning the merit of his claim and things he would be required to do in order to successfully pursue it.

And, in denying the Government's motion to alter or amend the sanctions order, it stated:

[T]he court remains persuaded that the most reasonable inferences to be drawn from the record are that Brown and Hughes had no intention of engaging in serious or meaningful settlement negotiations with Dawson and that their goal at each of the "settlement conferences" was to lead Dawson into walking away from his claim. In other words, the conduct of Hughes and Brown at each of the settlement conferences had as its goal "to discourage the poorer litigant and diminish his ... resolve to proceed to final judgment".

... At each of the meetings with Dawson, Hughes and Brown tried to persuade Dawson that defendant did not owe him a duty of ordinary care, first contending that the absence of such a duty was based on the open and obvious nature of the condition and then, having failed to dissuade Dawson, by contending, at the second conference, that the Texas recreational statute caused defendant not to have a duty to exercise ordinary care for Dawson's safety. And, the court has no doubt that Hughes and Brown suggested to Dawson at the second settlement conference that in no

- 14 -

the hearing, the court made the following remarks about the local

United States Attorney's office to counsel from the Justice

Department:

> For your information, ... this [is] not a very pleasant thing for me to do. I have not enjoyed doing this, but, unfortunately, in the Civil Section of the U.S. Attorney's office here in Fort Worth there are more times than one where I had problems.... I just have the feeling that the Civil Section of the U.S. Attorney's office here in Fort Worth is not always candid with the Court and that the material I receive from that office has not been thought out and prepared. And it's very disappointing to me that I have to do the sort of things that I am doing today in this case.
>
> But I want it known to everyone that comes in my court that I take seriously the local rules of my court that includes Local Rule 9.1 and my orders that deal with settlement conferences, and I don't think the U.S. Attorney's office takes that seriously, and they certainly haven't taken it seriously in this case.[10]

---

> event would he be entitled to receive any settlement payment unless he could produce someone who had experienced a similar accident. Statements were made to Dawson that were calculated to affirmatively mislead him.

[10] It bears noting that the district court and the Government had disagreed earlier about the extent of the court's inherent power to maintain a standing order requiring the Government to send a representative with full settlement authority to settlement conferences in all civil cases. *See In re Stone*, 986 F.2d 898, 900, 903 (5th Cir. 1993) (per curium) (district court has "general inherent power to require a party to have a representative with full settlement authority present--or at least reasonably and promptly accessible--at pretrial conferences", but such power should be "very sparingly used"). Our court's opinion in *Stone* was rendered on March 12, 1993, one day after the show-cause hearing in this case, and approximately 16 months prior to the order imposing sanctions. We are most confident that this issue had no bearing on the district court's actions here, as it so noted. When referring to other problems with the United States Attorney's office in Forth Worth, the court stated:

The district court ordered Dawson to file an affidavit by March 22, explaining why he failed to appear at both the pretrial conference and the show-cause hearing, or suffer dismissal with prejudice, without further notice. Once again, Dawson did not comply; his action was dismissed with prejudice on March 23, 1993.

Sixteen months later, in July 1994, the district court rendered a 33-page opinion and order, supplementing its bench findings from the show-cause hearing. It concluded that Hughes and Brown should be sanctioned, pursuant to the court's inherent powers, because, contrary to the Local Rule, the Government had not made a good-faith effort to settle.[11] The court found that Hughes

> And I am not talking about the problem of the U.S. Attorney's office in not honoring the obligation that I have imposed to have someone present with settlement authority because I recognize that's a legal issue the Fifth Circuit is going to have to decide, and I am not taking that into account in anything I am doing here.

As discussed *infra*, the court stated in its subsequent opinion imposing sanctions that they were "of significantly less magnitude than would have been imposed" had the Government and its counsel not shown an improvement in their willingness to engage in meaningful settlement negotiations during the 16 months between the show-cause hearing and the imposition of sanctions.

[11] The reason given for "most" of the extreme delay in rendering the opinion was "an extensive delay in the obtaining by the court of a transcript that had been ordered by the defendant from the court's former court reporter over one year ago". In light of the extreme and immediate attention to detail required of counsel by the district court, not to mention the bench findings of bad faith by counsel, it would seem that the district court would have rendered its opinion immediately after the hearing. We are confident that the district court requires no less of itself than it does of counsel. In sum, whatever the reasons for the transcript delay, the court, no doubt, could have caused its preparation (or its receipt) to be expedited, so that this most serious matter, including the cloud over counsel, could be resolved

failed to prepare adequately for participation in settlement negotiations, engaged in affirmative misconduct in anticipation of, and during, the negotiations, and was not candid with the court when describing reasons for action taken at the settlement conferences.[12] It imposed the following sanctions on him: (1) a

_____

promptly.

[12] The following are illustrative of the court's findings of intentional misconduct:

1. In its bench findings at the show-cause hearing, the court found that Hughes had not told the truth when he said he had no knowledge of the potential applicability of 18 U.S.C. § 4042 until it was called to his attention at the March 4 hearing:

> To me, that defies comprehension that members of the staff of the U.S. Attorney's office in Fort Worth, Texas where a federal prison is located have never been curious enough about what the duty owed to those inmates is by the United States government....

> I don't believe that they didn't know about it. I am going to have to conclude Mr. Hughes is not telling me the truth....

> I think he intentionally misrepresented to me at the last hearing that he didn't know about it or that it did not have anything to do with the tort claims case when he knew that it had something to do with this case.

The opinion rendered more than a year later reflects that the court persisted in that belief:

> Giving Hughes the benefit of having an average level of competence, he inescapably would have learned over those years of, and would have understood, the federal statute that creates and defines the duty of care owed by the Bureau of Prisons to a prisoner.

2. The court found that, by relying on the Texas statute as an affirmative defense, counsel "were trying to create a false appearance of the government's position in this case in order to justify a bad faith decision not to make an offer of settlement in

- 17 -

strong reprimand that his conduct in relation to the settlement negotiations was highly inappropriate and unacceptable, and (2) attendance at a 15-hour course on an attorney's ethical responsibilities. The court found Brown's conduct less serious;

_____

the case".

3.    At the show-cause hearing, the court stated that "both Mr. Brown and Mr. Hughes made up their minds before each of these settlement conferences that there would be no financial offer made to [Dawson]". Similarly, in its opinion imposing sanctions, it found that the Government and its counsel "had predetermined" prior to both settlement conferences "that no good faith settlement offer would be made to Dawson and that counsel for defendant would merely pretend that they were engaging in settlement negotiations instead of honestly engaging in such negotiations".

4.    The court found that, at both settlement conferences, counsel "made misrepresentations to Dawson of pertinent factors relative to his claim" (referring to the "alleged open and obvious nature of the conditions that caused his accident and injuries", and the "nonmeritorious motion for summary judgment"). At the show-cause hearing, the court stated:

> No doubt they urged on Dawson at th[e] [second] settlement conference the notion that their summary judgment had merit and that defendant did not owe Dawson the duty to exercise ordinary care for his safety. Moreover, the statements of defense counsel lead the court to infer that they suggested to Dawson that he would not be entitled to receive any payment in settlement of his claim unless he could produce someone who had experienced an accident similar to his as a result of the conditions that caused his.

And, in its opinion imposing sanctions, the court stated:

> Undoubtedly, counsel for defendant devoted significant time at both settlement conferences to falsely describing to Dawson the merit of his claim and the applicable law. They certainly have been less than candid in their presentations to the court on those subjects; and, there is no reason to think that they did not make statements to Dawson that were at least equally lacking in candor.

- 18 -

but, because he joined in "the charade that appears to have been orchestrated by Hughes at the two settlement conferences", the court found that he should be sanctioned by "a strong reprimand that his conduct in relation to the settlement negotiations in this case was highly inappropriate and unacceptable". The court explained why it selected these forms of sanctions:

> During the extended period of time that has elapsed between the time the show cause hearing was held ... , and the preparation of this memorandum opinion and order, [the] United States of America and the attorneys representing her have shown significant improvement in their willingness to engage in meaningful settlement negotiations and, if appropriate to do so, to conclude by settlement civil cases to which she or one of her agencies is a party. Nevertheless, the court has concluded that sanctions should be imposed on Hughes and Brown, though of significantly less magnitude than would have been imposed if the change in attitude mentioned above had not occurred.

The Government moved to alter or amend the sanctions order.[13] In its supporting brief, it contended that, as construed, the Local Rule exceeded the court's authority over settlement matters and violated the separation of powers doctrine; and, that the district court made significant factual and legal errors.

In a 37-page opinion denying the motion and supplementing the findings made both at the show-cause hearing and in the opinion imposing sanctions, the court found that "settlement negotiations, and any realistic chance of settlement, ... were thwarted when Hughes and Brown went to the settlement conferences with the

---

[13] The district court granted appellants' motion to stay sanctions pending ruling on the motion to alter or amend.

- 19 -

intention from the outset of not seriously engaging in settlement negotiations".  It found further that Hughes' and Brown's "lack of respect for the requirements of the local rule ... alone justifies the sanctions", as demonstrated by the Government's position that "if in an attorney's view the making of a settlement offer is not in his client's best interest, no offer should be forthcoming". The court was "dismayed" that Hughes and Brown "would openly maintain that the `good-faith effort to settle' and `settlement negotiations' requirements of Local Rule 9.1(a) permit them to refuse to offer any money to an inmate-plaintiff `simply because they thought the plaintiff would be unable to present his case adequately at trial'".  Moreover, it was "disappointed" that Hughes and Brown maintained that a refusal to engage in meaningful settlement negotiations could be justified by a desire to discourage future prisoner litigation.[14]

The court found that the assertion that Hughes and Brown had the absolute right to refuse to make a settlement offer "is really

---

[14]    The court stated:

> If a party is faced with recurring frivolous litigation, a declination to make a settlement offer in a frivolous action for the purpose of discouraging other frivolous actions would be legitimate and come within the parameters of good-faith efforts to settle.  However, the court cannot countenance conduct that, in effect, manifests an attitude by the government that it is entitled to decline to engage in meaningful settlement negotiations simply for the purpose of discouraging future prisoner litigation without regard to the merits of the litigation.  Such an attitude flies directly in the face of the requirements of Local Rule 9.1(a).

a contention that [they] had the right arbitrarily to disregard the requirements of [the] Local Rule";[15] and it rejected the Seventh Circuit's suggestion in *G. Heileman Brewing Co., Inc. v. Joseph Oat Corp.*, 871 F.2d 648, 653 (7th Cir. 1989) (en banc), that a sanction cannot be based on a party's refusal to make a monetary offer. The district court stated:

> An essential element of any good-faith effort to settle and meaningful settlement negotiations is a willingness to make a monetary offer if a good-faith evaluation of the respective positions of the parties in the case would indicate that such an offer would be appropriate and adequate resources are available.

Finally, as an alternative basis for sanctions, the court concluded that they were justified because Hughes and Brown did not attend the settlement conferences with an "open mind" and, therefore, had not made a good-faith effort to settle.[16]

---

[15] The court criticized the Government's assertion that the decision whether to risk an adverse judgment was for the Attorney General and her delegates, not the court:

> This argument is the equivalent of assertions by Movants that the court has absolutely no power to make an inquiry into the propriety of the settlement conduct of the government and that, therefore, Local Rule 9.1 is, for practical purposes, unenforceable against Movants. Obviously, if the court cannot make inquiry into a party's settlement conduct, and sanction the party for misconduct, the local rule requiring specified kinds of settlement conduct becomes an empty shell.

[16] After the district court denied a stay of sanctions pending appeal, our court granted it.

The appellants contend, *inter alia*, (1) that the district court exceeded its authority by imposing sanctions based on its construction of the Local Rule to include, as an essential element of a "good faith effort to settle", making an offer commensurate with the party's litigation exposure; and (2) that the court's finding of bad faith is otherwise clearly erroneous.[17]  Although we conclude that the district court's application of the Local Rule is a sufficient ground for vacating the sanctions, we address, as well, its alternative basis for sanctions -- the ultimate finding of bad faith by Hughes and Brown as a result of their conduct.  We do so because of the serious cloud on their professional reputations caused, not only by that finding, but also by the findings upon which it was based.

Sanctions are reviewed for abuse of discretion.  *American Airlines, Inc. v. Allied Pilots Ass'n*, 968 F.2d 523, 529 (5th Cir. 1992).  "[T]he threshold for the use of inherent power sanctions is high".  *Elliott v. Tilton*, 64 F.3d 213, 217 (5th Cir. 1995). Accordingly, "[i]n order to impose sanctions against an attorney under its inherent power, a court must make a specific finding that the attorney acted in `bad faith'." *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995).  And, a "district court would

[17]  Because we conclude that the district court abused its discretion by imposing sanctions based both on its interpretation of the Local Rule, and on its alternative finding of bad faith, we need not address the contentions that the rule, as applied, violates the separation of powers doctrine, or that due process was violated because the court acted as investigator, prosecutor, and adjudicator.

necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence". *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990). *See also* *Smith v. Our Lady of the Lake Hosp., Inc.*, 960 F.2d 439, 444 (5th Cir. 1992). "Generally, an abuse of discretion only occurs where no reasonable person could take the view adopted by the trial court. If reasonable persons could differ, no abuse of discretion can be found." *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995) (Rule 11 sanctions).

> Although we review a district court's use of its inherent power [to sanction] only for abuse of discretion, ... our review is not perfunctory. As the Supreme Court has explained, "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." ... The Court has also cautioned restraint in the use of inherent powers "[b]ecause of their very potency."

*Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469 (D.C. Cir. 1995) (citations omitted) (reviewing district court's use of inherent power to punish litigation misconduct by entry of default judgment).

The district court held that, in order to comply with the Local Rule,

> the party must (a) acquire sufficient knowledge of the facts and the applicable law to evaluate the party's litigation exposure, (b) make an honest appraisal of that exposure based on applicable legal rules and the known facts, (c) honestly and objectively conduct settlement discussions with the opposing party, and (d) *make a settlement offer commensurate with the party's litigation exposure*.

- 23 -

(Emphasis added.)  On the other hand, the court acknowledged that a party should not be forced to settle at any cost, or sacrifice an uncompromisable principle in order to accomplish settlement; but, it found no such principle involved in this case, which, it opined, could have been settled for $10,000, or less, at the second settlement conference.  Similarly, in denying the motion to alter or amend, the district court disclaimed any "goal [of] forcing any party to make a settlement offer if the party has a legitimate reason for not making an offer".

1.

The district court's assessment of the Government's litigation exposure appears to have been based primarily on its conclusion that the Texas recreational use statute, relied upon by the Government to contend that Dawson could not recover unless he proved gross negligence, malice, or bad faith, was inapplicable.[18]

_____

[18]   At the show-cause hearing, the court also voiced skepticism about the Government's contention in the pretrial order that the proximate cause of Dawson's injuries was his failure to care for his own safety and to keep a proper look-out:

> That may well be what the conclusion would be on the merits of the trial of this case, but the facts of this case are such that certainly it is not a foregone conclusion that those facts would be determined because it occurs to me when somebody is chasing a fly ball they are expected to look for the ball and not the wires.  And when you have put wires out in the middle of the playing field, you ought to know people are going to be looking at balls and not wire and someone is going to get hurt when they trip over the wires in that playing field.  I believe the attorneys for the government are smart enough to realize that, and I believe they were smart enough to know, and continue to be smart

- 24 -

As noted, the court found that the Government acted in bad faith by relying on state law, holding that the standard of care was established instead by 18 U.S.C. § 4042. We need not decide whether § 4042 or the Texas statute governed in this FTCA action; suffice it to say that this is a question of law on which reasonable minds could differ.[19] And, needless to say, a district court's disagreement with the merits of a position asserted in good faith by counsel cannot serve as the basis for sanctions. *See* *F.D.I.C. v. Calhoun*, 34 F.3d 1291, 1298-99 (5th Cir. 1994) (district court abused its discretion by imposing FED. R. CIV. P. 11 sanctions where argument was not "implausible, unreasonable, or otherwise frivolous").

The district court acknowledged that it had no power to, and should not, coerce a settlement; and it stressed that it was not sanctioning Hughes and Brown for failing to achieve one. But, it maintained that it did have the power to coerce compliance with the "good faith effort to settle" and "settlement negotiations" requirements of the Local Rule which, as stated, it interpreted as requiring that, on the facts in this case, a monetary settlement

---

enough to know, that there was a significant risk in this case.

[19] For a classic example of the not infrequent complexities of FTCA litigation, see our recent decision in *Johnson v. Sawyer*, 47 F.3d 716, 728 (5th Cir. 1995) (en banc) ("violation of a federal statute or regulation does not give rise to FTCA liability unless the relationship between the offending federal employee or agency and the injured party is such that the former, if a private person or entity, would owe a duty under state law to the latter in a *nonfederal* context") (emphasis in original).

offer should have been made.[20]  Although we applaud the district court's efforts to encourage and facilitate settlements, we conclude, as also discussed *infra*, that it abused its discretion by interpreting the rule to require, for this action, making a settlement offer as part of a good-faith effort to settle.

Obviously, there is no meaningful difference between coercion of an offer and coercion of a settlement:  if a party is forced to make a settlement offer because of the threat of sanctions, and the offer is accepted, a settlement has been achieved through coercion. Such a result cannot be tolerated.  *See **National Ass'n of Gov't***

---

[20]    The record supports overwhelmingly the assertion that the district court's interpretation of Local Rule 9.1(a) as requiring, on the facts in this case, that a settlement offer be made, and the Government's refusal to make an offer, were the primary bases for the sanctions.  For example, at the show-cause hearing, the court stated:

> [I]f the government was acting in good faith, they would have made some kind of offer to Mr. Dawson at that first settlement conference in order to get the ball rolling.
>
> Even though a party to the negotiations takes a very unreasonable position in demanding more than he possibly could or should receive, a good-faith effort to settle means the other party will not then balk and do nothing.  *It means the other party will at least go forward and try to keep the ball rolling, and the only way you can keep the ball rolling is make some kind of offer, even if it is only $500 or $1,000*.  And I think if defense counsel would have been acting in good faith at that point in time, they would have made an offer of some kind to keep the ball rolling, particularly in view of what they then knew.  They then knew the man was on the playing field chasing a fly ball when he tripped over a wire.

(Emphasis added.)

*Employees, Inc. v. National Federation of Fed. Employees*, 844 F.2d 216, 223 (5th Cir. 1988) ("[f]ailure to compromise a case ... even pursuant to terms suggested by the court, does not constitute grounds for imposing sanctions"); *see also* **In re Ashcroft**, 888 F.2d 546, 547 (8th Cir. 1989) ("[p]retrial-conference discussion of settlement is designed to encourage and facilitate settlement ... but it is not designed to impose settlement upon unwilling litigants"); *G. Heileman Brewing Co. v. Joseph Oat Corp.*, 871 F.2d at 653 ("If this case represented a situation where ... [a party] was sanctioned because [it] refused to make an offer to pay money -- that is, refused to submit to settlement coercion -- we would be faced with a ... situation we would not countenance"); *Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir. 1985) ("the law ... does not sanction efforts by trial judges to effect settlements through coercion"); *Abney v. Patten*, 696 F. Supp. 567, 568 (W.D. Okla. 1987) ("The horses may be led to water.  Whether they drink is up to them.").

### 2.

Early settlement of cases is an extremely laudable goal, which federal judges have considerable power to encourage and facilitate, *see, e.g.,* FED. R. CIV. P. 16, and which is essential to controlling the overcrowded dockets of our courts.  And, we commend the district court for its concern for protecting *pro se* plaintiffs' (particularly *pro se* prisoners') rights.  On the other hand, as the district court acknowledged, parties may have valid and principled reasons for not wishing to settle particular cases.  These reasons

may not be based necessarily on the merits of a particular case, or the party's possible exposure in it, but because of the effect that a settlement might have on other pending or threatened litigation.

Here, two of the Government's numerous (and, it seems, very valid) reasons for not making a monetary offer were because Dawson was (before his release while his action was pending) a *pro se* prisoner who had not shown much interest in prosecuting his claims, and because of the concomitant (and most legitimate) concern that settlement might encourage other prisoners to file frivolous lawsuits in the hopes of recovering a "nuisance value" settlement. It goes without saying that courts, among other entities, provide recourse for *pro se* prisoners, just as they do for other litigants; but, a plaintiff's status as a prisoner, *pro se* or otherwise, is a legitimate factor for the opposing party to consider in determining whether to make a settlement offer. In light of the increasing flood of prisoner litigation that threatens to submerge our courts, such a factor is extremely relevant, especially when the Government is the defendant and the taxpayers will be footing the bill for any settlement.[21]

---

[21] This brings to mind one of the principles learned early and painfully by our Nation (and it is hoped still taught early to schoolchildren), and enunciated in stirring fashion by Robert Goodloe Harper's toast at a banquet for John Marshall in 1798: "Millions for defense, but not one cent for tribute". The toast was attributed to Charles Cotesworth Pinckney, our minister in 1797 to the French Republic, who, when told that American commissioners in Paris to protest French attacks on United States shipping would be received only if they paid a $50,000 bribe and loaned a large amount of money to France, replied, "Not a sixpence, sir". JOHN BARTLETT, FAMILIAR QUOTATIONS 367 (Justin Kaplan, 16th ed. 1992).

Because of such bullying by the British, and especially the

- 28 -

Along that line, another factor bears mentioning -- administrative exhaustion required by the FTCA, 28 U.S.C. § 2675(a).  As noted, when Dawson filed this action, his claim had been reviewed and rejected by the Bureau of Prisons.  It investigated the claim, and concluded that the offending pole was open and obvious, and that Dawson had assumed the risk of injury. *See* 28 U.S.C. § 2672 (providing that the head of each federal agency or his designee "may consider, ascertain, adjust, determine, compromise, and settle any claim for money damages against the United States for injury or loss of property or personal injury ... caused by the negligent or wrongful act or omission of any employee of the agency while acting within the scope of his office or employment").

The exhaustion requirement serves "to ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States ... [and] of providing for more fair and equitable treatment of private individuals and claimants when they deal with the Government or are involved in litigation with their Government".  ***Adams v. United States***, 615 F.2d 284, 288 (5th Cir.

French ("Quasi War"), Congress in 1797 authorized resumption of the construction of six frigates, including the famous, and much beloved, USS Constitution ("Old Ironsides").  (The ships' construction had been authorized originally in order to fight the Barbary pirates, who likewise sought to extort money from the infant United States.)  THOMAS P. HORGAN, OLD IRONSIDES 12, 14, 24 (1963).  In light of the matter before us, it is somewhat ironic that this proud ship, built at considerable expense as an alternative to monetary appeasement, bears the name of the document which trumpets fundamental fairness for all, *even* Assistant United States Attorneys.

1980) (internal quotation marks and citations omitted). "An added factor in federal prisoner cases is the congressional decision to vest control of federal penal correctional institution policy, including that affecting free world citizens, in the Bureau of Prisons." *Miller v. Stanmore*, 636 F.2d 986, 991 n.5 (5th Cir. 1981).

Armed with this claim rejection, as well as other information, Hughes and Brown complied with the court's orders to meet with Dawson and discuss settlement. It goes without saying, that, as noted, they appear to have had numerous legitimate reasons for not offering the taxpayers' money to Dawson. Accordingly, the alternative reason given for sanctions, that Hughes and Brown did not attend the settlement conferences with an "open mind", is clearly erroneous, as are other findings, quoted extensively in this opinion, upon which the court made its ultimate finding of bad faith.

In sum, Hughes and Brown should not have been sanctioned. Likewise, findings that they acted improperly, or unprofessionally, in the manner in which they handled this action are clearly erroneous. To that end, we find most inappropriate the district court's conclusions that they, in effect, tried to manipulate, or take advantage of, Dawson at the settlement conferences or in preparing the pretrial order. No more need be said; this most regrettable chapter is closed.

III.

For the foregoing reasons, the findings and conclusions of bad faith are **REVERSED**, and the order imposing sanctions on R. Wayne Hughes and Claude D. Brown is **VACATED**.

**REVERSED AND VACATED**