# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 6, 2012

No. 11-41199

Lyle W. Cayce
Clerk

SCOTT BALDWIN, JR.; SJBR ENTERPRISES, INC.; JOHN B. BALDWIN,

Plaintiffs - Appellees,

v.

CLIFFORD W. CAVETT; CAVETT, TURNER AND WYBLE, L.L.P.,

Defendants - Appellants.

Consolidated with 12-40289

SCOTT BALDWIN, JR.; SJBR ENTERPRISES, INCORPORATED; JOHN B.
BALDWIN,

Plaintiffs - Appellees,

v.

LARRY A. TURNER; ROBERT J. WYBLE,

Defendants - Appellants.

Appeals from the United States District Court
for the Eastern District of Texas
USDC No. 2:10-CV-401

Before HIGGINBOTHAM, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:[*]

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not
be published and is not precedent except under the limited circumstances set forth in 5TH CIR.
R. 47.5.4.

No. 11-41199

In this case we must decide whether the defendants may rely on an arbitration agreement they did not sign to compel the plaintiffs' claims against them to arbitration. The defendants' motions to compel arbitration were denied in the district court based on the conclusion that there is no agreement to arbitrate the plaintiffs' claims. For the reasons that follow, we find no reversible error and, therefore, AFFIRM the orders denying the motions to compel arbitration.

I.

Clifford W. Cavett ("Cavett"), Larry A. Turner ("Turner"), and Robert J. Wyble ("Wyble") are partners in the accounting firm Cavett, Turner & Wyble L.L.P. ("CTW"). According to the Second Amended Complaint, Cavett and CTW began providing accounting services to Scott and John Baldwin, their law firm, and several Baldwin family entities (collectively, "the Baldwins") in the mid-1990s. In 2000 and 2001, the Baldwins allege that Cavett, in his role as the representative of CTW, conducted quarterly meetings with Scott Baldwin to discuss the Baldwins' tax returns, business records, and the accounting details of the Baldwins' investment accounts. During these meetings, Cavett allegedly told Scott Baldwin that his current investment advisor was charging excessive fees and encouraged the Baldwins to transfer their investment accounts to Ronald J. Legnion ("Legnion"), a registered securities broker with Raymond James Financial Services ("RJFS").

Eventually, in December 2004, the Baldwins opened their first account with RJFS. When opening the account, Scott Baldwin signed two documents. First, he signed a "Disclosure of Receipt of Other Compensation From Referral of Clients to Raymond James Financial Services by Partners and Staff of Cavett,

2

No. 11-41199

Turner & Wyble, L.L.P." (the "Disclosure Form"), which explained that Cavett, Turner, and Wyble are also partners with Legnion in LTC Financial Services, Ltd. ("LTC"). The Disclosure Form specified that Legnion assigns to LTC all of the compensation he receives from servicing RJFS accounts, and that a portion of those earnings are allocated to Cavett, Turner, and Wyble based on their interest in LTC. The Disclosure Form did not contain an arbitration clause.

Second, Scott Baldwin signed an RJFS New Account Form, which Legnion also signed as "Financial Advisor" and "Branch Manager." Cavett did not sign the New Account Form and was merely listed as the "CPA" designated to receive duplicate copies of RJFS statements. Above Scott Baldwin's signature on the New Account Form is the following statement: "By signing below, I acknowledge that I have received, read, understand, and agree to abide by all the terms and conditions set forth in the Client Agreement incorporated herein by this reference."

The Client Agreement is a two-page, unsigned document that contains the following arbitration clause:

> Any dispute or controversy, either arising in the future or in existence now, between me and you (including your officers, directors, employees or agents and the introducing broker, if applicable) will be resolved by arbitration conducted before the New York Stock Exchange, Inc., the National Association of Securities Dealers, Inc., the American Stock Exchange, Inc., or other self-regulatory organizations (SRO) subject to the jurisdiction of the Securities and Exchange Commission (SEC) pursuant to the arbitration rules of the applicable SRO.

This clause applies to each of the accounts that the Baldwins opened with RJFS.

Cavett and CTW continued to provide accounting services to the Baldwins after they opened the RJFS accounts, and the Baldwins signed additional

No. 11-41199

documents clarifying the accounting services that they were receiving. Specifically, in November 2005, Scott Baldwin signed an "Outside Activity Disclosure Letter" (the "Activity Letter"), which states: "I understand that the below noted product/service is being offered to me by my CPA in his/her individual capacity and not in the capacity as a registered representative of [RJFS]." The "product/service" listed in the Activity Letter was "Cavett Turner & Wyble (Certified Public Accountants)." Soon after Scott Baldwin signed the Activity Letter, Cavett executed and delivered to him another letter (the "Engagement Letter"), which was "to confirm [their] understanding of the terms and objectives of [their] engagement and the nature and limitations of the services [CTW] will provide." The Engagement Letter described three accounting services: (1) compiling interim and annual statements of assets, liabilities, and capital; (2) preparing quarterly and year-end payroll returns and information reports; and (3) preparing federal income-tax returns.

The Baldwins allege that by May 2006 they had moved all of their investments to RJFS because Cavett told them that doing so would be good from a tax perspective. They further allege that Cavett continued to provide them with tax advice regarding their investments. The parties sharply dispute whether the Baldwins knew that Cavett was working not only with Legnion, but also as a RJFS securities broker himself.

As the financial markets plummeted in 2007 and 2008, the Baldwins told Cavett that they wanted to get out of the market. Cavett allegedly convinced the Baldwins to stay in the market because, again, it would be good from a tax standpoint. By 2009, the value of the Baldwins' investments had decreased substantially.

4

No. 11-41199

In September 2010, the Baldwins sued Cavett and CTW in the Eastern District of Texas. The Baldwins' suit alleges violations of the Racketeer Influenced and Corrupt Organizations (RICO) statute, *see* 18 U.S.C. § 1961 *et seq.*, as well as various state-law claims, including common law fraud, negligent misrepresentation, accountant malpractice, and breach of fiduciary duty. Cavett and CTW moved to compel the dispute to arbitration based on the arbitration clause in the Client Agreement. The Baldwins opposed the motion and filed their First Amended Complaint, which altered several allegations concerning Cavett. Cavett and CTW then filed a motion to compel the revised claims in the First Amended Complaint to arbitration.

The district court referred the case to a magistrate judge for pretrial purposes. On September 12, 2011, the magistrate judge issued a report recommending that the district court deny Cavett and CTW's motion to compel arbitration. The district court adopted the magistrate judge's conclusions and denied the motion to compel arbitration, which prompted Cavett and CTW to appeal.

After Cavett and CTW filed their notice of appeal, the Baldwins filed a Second Amended Complaint adding Turner and Wyble as defendants. Turner and Wyble moved to compel the Baldwins' claim to arbitration, arguing essentially the same theories that Cavett and CTW previously advanced. Because those arguments were resolved in the earlier ruling on Cavett and CTW's motion to compel arbitration, the motion was denied. Turner and Wyble then filed a notice of appeal. The two appeals have been consolidated in this court.

## II.

To determine whether a person may be compelled to arbitrate, we apply a two-step analysis. *Jones v. Halliburton Co.*, 583 F.3d 228, 233–34 (5th Cir.

No. 11-41199

2009) (citing *Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008)).  First, we examine whether the person agreed to arbitrate the dispute. *Id.*  This inquiry requires us to ask: "(1) is there a valid agreement to arbitrate the claims and (2) does the dispute in question fall within the scope of that arbitration agreement."  *Id.* at 234 (quoting *Sherer*, 548 F.3d at 381).  Second, if the answer to both of these questions is "yes," we consider whether any federal statute or policy renders the dispute nonarbitrable.  *Id.*

Our inquiry here begins and ends with the first step.  While Cavett and the other defendants contend that there is an agreement to arbitrate the Baldwins' claims, their arguments are unpersuasive for the reasons below.

A.

Cavett, Turner, and Wyble argue that they are "parties" to the arbitration clause contained in the Client Agreement because it expressly references "employees or agents" of RJFS.  We disagree.

Our jurisprudence recognizes an important distinction between signatories and nonsignatories to an arbitration agreement.  *See, e.g.*, *Westmoreland v. Sadoux*, 299 F.3d 462, 465 (5th Cir. 2002) (stating that "an arbitration clause must be in writing and signed by the party invoking it" and explaining that "we will allow a nonsignatory to invoke an arbitration agreement only in rare circumstances").  Here, it is undisputed that Cavett, Turner, and Wyble did not sign the New Account Forms or Client Agreements that contain the arbitration clause.  Furthermore, generally-applicable rules of contract interpretation and enforcement govern arbitration clauses.  *See* 9 U.S.C. § 2.  The parties here have assumed that Texas law applies, and three elements comprise contract formation in Texas: offer, acceptance, and a "meeting of the minds."  *Bocchi Ams. Assocs., Inc v. Commerce Fresh Mkt., Inc.*, 515 F.3d 383, 392 (5th Cir. 2008) (citing *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st

No. 11-41199

Dist.] 2002, pet. denied)).  Cavett neither made an offer to the Baldwins, nor accepted an offer from them.  The same is true for Turner and Wyble.  Therefore, under ordinary contract principles, Cavett, Turner, and Wyble are not parties to the arbitration agreement.  We reject their attempts to refute this straight-forward conclusion.

## B.

Cavett, Turner, and Wyble next contend that there is an agreement to arbitrate the Baldwins' claims against them because they are agents of RJFS. In *Westmoreland*, we joined other courts of appeal in concluding that a nonsignatory may not compel arbitration "merely because he is an agent of one of the signatories."  299 F.3d at 466.  But Cavett, Turner, and Wyble assert that this case is different because the arbitration clause applies to "[a]ny dispute or controversy" and "includes . . . employees or agents."  They insist that they may compel to arbitration *any* claims that *any* RJFS customer subject to the Client Agreement may have against them for *any* conduct, no matter how unrelated to their work for RJFS.  In support of this argument, they direct us to *In re Rubiola*, 334 S.W.3d 220 (Tex. 2011).  We agree that *Rubiola* is instructive here, but it reveals that Cavett, Turner, and Wyble's position is untenable.

In *Rubiola*, the Salmons agreed to purchase a home from Greg Rubiola, who along with his brother, J.C., operated several real estate businesses.  *Id.* at 222.  Greg and J.C. were president and vice-president, respectively, of Rubiola Mortgage Company ("RMC")—a corporation they used to obtain financing for real estate buyers.  *Id.*  The Salmons applied for mortgage financing with RMC, and as part of the lending process, executed an arbitration agreement with RMC. *Id.*  The arbitration agreement applied to "any and all controversies or claims between the parties of whatever type or manner," and it expressly defined "parties" to include:

No. 11-41199

> Rubiola Mortgage Company, and each and all persons and entities signing this agreement or any other agreements between or among any of the parties as part of this transaction. "The parties" shall also include individual partners, affiliates, officers, directors, employees, agents, and/or representatives of any party to such documents, and shall include any other owner and holder of this agreement.

*Id.* at 222–23.  J.C. signed the agreement on behalf of RMC, but Greg did not sign it.  *See id.* at 223.  The Salmons later sued Greg and J.C., alleging, in part, that J.C.—as both a listing agent and a principal involved in the construction and repair of their home—made numerous misrepresentations.  *Id.*  The Rubiolas moved to compel the Salmons' claims to arbitration, arguing that they could rely on the arbitration agreement as officers and representatives of RMC. *Id.* at 224.  The *Rubiola* court agreed.  *Id.*  The arbitration agreement explicitly provided that nonsignatory officers and representatives were parties to the agreement, and the Rubiolas were thus entitled to compel arbitration in their capacity as officers and representatives of RMC.  *See id.* at 224–25.

Cavett, Turner, and Wyble would have us focus entirely on the similarity between the arbitration agreement in *Rubiola*, which expressly referenced officers and representatives of a signatory, and the agreement here, which "includes . . . employees or agents" of a signatory.  But we cannot divorce the language of the arbitration agreement from the facts.  That is because here, as in *Rubiola*, the nonsignatories' ability to compel arbitration depends on their relationship with a signatory.  Cavett, Turner, and Wyble derive their arbitration rights from RJFS, just as the Rubiolas derived their arbitration rights from RMC.  In both cases, acting on behalf of the signatory is a necessary condition to relying on the arbitration clause.[1]  While that did not present an

---

[1] Despite Cavett, Turner, and Wyble's argument to the contrary, our conclusion here is consistent with *Downer v. Siegel*, 489 F.3d 623 (5th Cir. 2007).  There, we addressed the scope of an arbitration clause and held that the parties' dispute was within the scope of the

## No. 11-41199

obstacle to compelling arbitration in *Rubiola*, it does here.  For their part, Turner and Wyble make no argument that they were acting on behalf of RJFS when they allegedly engaged in the conduct of which the Baldwins complain. Regarding Cavett, the district court adopted the magistrate judge's determination that Cavett was not acting on behalf of RJFS when he provided the services on which the Baldwins base their claims.  Cavett contends that determination was erroneous, but we disagree.

The magistrate judge's report to the district court explained that Cavett provided the Baldwins with general accounting services for over seven years before engaging in the activities of which the Baldwins complain in this suit. When the Baldwins decided to open accounts with RJFS, Cavett referred them to his partner, Legnion, instead of representing them himself.  Soon after the Baldwins executed the New Account Forms, they signed the Activity Letter, which notified them that the accounting services they were receiving from CTW were "being offered to [them] by [their] CPA in his/her individual capacity and not in the capacity as a registered representative of [RJFS]."  Then, in the Engagement Letter, Cavett represented to the Baldwins that he was providing them with three specific types of accounting services.  Furthermore, the New Account Forms merely listed Cavett as the "CPA" to receive duplicate copies of financial statements, while Legnion was identified as the "Financial Advisor." Based on these facts, the magistrate judge recommended and the district court concluded that "Cavett was acting outside of his role as an agent of RJFS in

---

clause because "[a] reasonable interpretation . . . support[ed] a conclusion that the clause cover[ed] the dispute."  *Id.* at 626.  This case is different from *Downer* because we deal here not with the scope of an arbitration clause, but with whether there is an agreement to arbitrate the claims.  We need not reach the question of scope when there is no agreement to arbitrate, *see Jones*, 583 F.3d at 233–34, and as we explain above, there is no such agreement between Cavett, Turner, and Wyble and the Baldwins.

providing the [Baldwins] with the general accounting and investment tax advice at issue in this case."

The standard of review we use in reviewing the district court's conclusion depends on the nature of the case. Whether an employee or agent was acting within the course and scope of his work is a mixed question of law and fact. *Beech v. Hercules Drilling Co., L.L.C.*, 691 F.3d 566, 569 (5th Cir. 2012) (quoting *Hussaini v. Marine Transp. Lines, Inc.*, 158 F.3d 584 (5th Cir. 1998) (unpublished)). If legal issues predominate, such as when all of the facts are settled and undisputed, then we review *de novo* the district court's application of the law to the facts and its conclusion regarding whether an agent or employee was acting within the course of his work. *Id.* But when factual issues predominate, we review the district court's course-and-scope determination for clear error. *Id.* (quoting *Hussaini*, 158 F.3d at 584). Clear error exists only if this court, after reviewing the record, has a definite and firm conviction that the district court made a mistake. *Boudreaux v. United States*, 280 F.3d 461, 466 (5th Cir. 2002) (quoting *McAllister v. United States*, 348 U.S. 19, 20 (1954)); *see Estate of Lisle v. C.I.R.*, 541 F.3d 595, 601 (5th Cir. 2008) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573–74 (1985)). Here, factual questions predominate. The parties sharply dispute whether the Baldwins knew that Cavett was a registered RJFS securities broker. They also dispute whether Cavett provided the Baldwins with investment advice in his role as a broker, or tax advice in his role as an accountant. The clear-error standard therefore applies.

No. 11-41199

Our review of the record does not give rise to a definite and firm conviction that the district court made a mistake. The Activity Letter, Engagement Letter, and the other allegations recited in the magistrate's report support the district court's conclusion that Cavett was acting outside the course and scope of his relationship with RJFS when he provided the services that form the basis of the Baldwins' claims. Accordingly, the district court did not clearly err.

C.

As a nonsignatory, nonparty, nonagent, CTW asserts that it is entitled to compel the Baldwins' claims against it to arbitration based on principles of equitable estoppel. We disagree.

The doctrine of equitable estoppel can sometimes provide a basis for a nonsignatory to enforce an arbitration agreement against a signatory. *See Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000). We have recognized two scenarios in which equitable estoppel applies:

> (1) "[W]hen the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against the nonsignatory," and

> (2) "[W]hen the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more signatories."

*Id.* (emphasis and citation omitted). We review for abuse of discretion a district court's order denying a motion to compel arbitration based on equitable estoppel. *Weingarten Realty Investors v. Miller*, 661 F.3d 904, 912 (5th Cir. 2011). Generally, an abuse of discretion occurs only when no reasonable person could agree with the district court's decision. *Friends for Am. Free Enterp. Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575, 578 (5th Cir. 2002) (quoting *Dawson v. United States*, 68 F.3d 886, 896 (5th Cir. 1995)).

11

No. 11-41199

On the facts of this case, the district court did not abuse its discretion. The Activity Letter and Engagement Letter made clear to the Baldwins that the services Cavett was providing them through CTW were not in his capacity as a registered representative of RJFS. Based on these facts and the magistrate judge's recommendation, the district court concluded that the Baldwins' claims against CTW do not rely on the Client Agreement between the Baldwins and RJFS. The district court also concluded that CTW could not rely on the concerted-misconduct theory because Cavett was not a party to the arbitration agreement. CTW argues that this conclusion is erroneous because Cavett was a party to the arbitration agreement and acted in his capacity as an RJFS agent when providing the services of which the Baldwins complain. But for the reasons we explained above, Cavett was not a party to the arbitration agreement, and the district court did not clearly err in concluding that Cavett was acting outside of his role as an RJFS agent when he provided the advice at issue in this case. Therefore, CTW has not shown that the district court abused its discretion by denying CTW's motion to compel arbitration based on equitable estoppel. *See Weingarten*, 661 F.3d at 912; *Friends for Am. Free Enterp. Ass'n*, 284 F.3d at 578.

## III.

For the foregoing reasons, we find no reversible error and AFFIRM the orders denying the motions to compel arbitration.